JONES, Chief Judge, and LARAMORE, WHITAKER, and LITTLETON, JJ., concur.

**PAN AMERICAN WORLD AIRWAYS, Inc.**

v.

**UNITED STATES.**

No. 221–53.

United States Court of Claims.

July 13, 1954.

Robert C. Barnard, Washington, D. C., Henry J. Friendly, New York City, Joseph J. Cantwell, Massapequa, N. Y., James W. Lamberton, Washington, D. C., Ann Thacher Clarke, New York City, and Cleary, Gottlieb, Friendly & Ball, Washington, D. C., on the briefs, for plaintiff.

Carl Eardley, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., Mary K. Fagan, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

This is an action filed by plaintiff Pan American World Airways, Inc., an air carrier, in which it seeks to recover the sum of $207,092.50. The complaint recites that this amount was exacted from plaintiff by the Immigration and Naturalization Service for detention of United States citizens, passengers on plaintiff's airline, who were seeking to enter the United States; that the expenses

were illegally exacted from plaintiff during the period May 25, 1947, to December 24, 1952, under color of statutes [1] and of regulations and rulings of the Immigration and Naturalization Service.[2] The complaint sets forth three alleged causes of action: (1) a claim founded upon regulations of an executive department and upon statutes of the United States, (2) a claim founded upon the Fifth Amendment to the Constitution, and (3) a claim founded upon an implied contract to refund the money taken from the plaintiff.

The answer of the defendant admits that the Immigration and Naturalization Service had detained citizens and nationals of the United States who were passengers on the plaintiff's aircraft. It further admits that the Immigration and Naturalization Service has collected from the plaintiff for the detention expenses of such citizens and nationals of the United States under the authority of rulings and regulations of the Immigration and Naturalization Service and pursuant to applicable law.

The case is submitted on plaintiff's motion for summary judgment, affidavits in support thereof, defendant's objections thereto, defendant's motion for summary judgment, and affidavits in support thereof.

The basic issues presented are: (1) whether the court has jurisdiction; (2) whether defendant had the right under the Immigration Act of 1917, 39 Stat. 874 et seq., to collect the disputed detention expenses; and (3) whether the payments made by the plaintiff were, in the circumstances, "voluntary," in a sense that would prevent their recovery.

We consider first the question of jurisdiction. For this purpose we assume that the Immigration and Naturalization officials misinterpreted the relevant statute; that the regulations which they purported to make pursuant to the statute were not authorized by the statute and were void; and that there was, therefore, no right in the Government to collect the money here in question from the plaintiff.

The Government urges that, assuming what we have assumed above, the acts of the officials in collecting the money were tortious, and that this court has, therefore, no jurisdiction to entertain a suit for its recovery. In the case of Clapp v. United States, 117 F.Supp. 576, 127 Ct.Cl. 505, we considered at length substantially the same question. We recognized that the course of decision had not run smoothly, and that the Supreme Court's decision in United States v. Holland-American Line, 254 U.S. 148, 41 S.Ct. 72, 65 L.Ed. 193, and this court's decision in Roger B. Wood v. United States, 61 Ct.Cl. 192, supported the Government's position. However, the considerable body of authority, both in the Supreme Court and in other Federal courts, and the compelling equities of these situations in which the Government admittedly has the citizen's money and seeks to keep it, seemed to us to justify our requiring the Government to disgorge what it has no right to retain.

■ We repeat our query, made in the Clapp case, supra, as to whether the collection of money by Government officials, pursuant to an invalid regulation, but for the purpose of turning the money into the United States Treasury, is really a "tort" within the meaning of that word as used in the Tucker Act, 28 U.S.C.A. §§ 1346, 1402, 1491, 2401. When Congress, having expressly given this court jurisdiction of claims "founded upon any express or implied contract with the United States", in the very next clause gave the court jurisdiction over claims "for liquidated or unliquidated damages

1. 8 U.S.C. § 147 (Act of February 5, 1917, [1952 Revision, 8 U.S.C.A. § 1222]; 8 U.S.C. §§ 151, 154, 173 (Act of February 5, 1917, as amended) [1952 Revision, 8 U.S.C.A. §§ 1101(a) (3, 10, 38), (b) (3), (d) (7)]; 8 U.S.C. § 501 [1952 Revision, 8 U.S.C.A. § 1101(a–c)] (Act of October 14, 1940).

2. 8 CFR, §§ 116.55, 155.1 (17 Fed.Reg. 4373); 8 CFR, § 155.9 (17 Fed.Reg. 4374).

in cases not sounding in tort," it must have supposed that there are non-contractual claims which do not sound in tort. We suggest that the type of claim here involved may be one of them.

We now consider the question whether the money here sued for was illegally exacted from the plaintiff by the Immigration and Naturalization officials. Sections 11 and 15 of Chapter 29 of the Act of February 5, 1917, 39 Stat. 881, which were, before the repeal of that Act by the Immigration and Nationality Act effective December 24, 1952, 8 U.S.C.A. § 1101 et seq., Sections 147 and 151 of Title 8 of the United States Code, are printed in a footnote.[3]

The exactions here in question were made pursuant to this statute, and ceased, of course, with the repeal of the statute in 1952.

The statute speaks only of the detention of aliens. The charges here in question were for the detention of citizens.

---

3. "§ 147. Detention of aliens for observation and examination; inspectors to report condition of vessels

"For the purpose of determining whether aliens arriving at ports of the United States belong to any of the classes excluded, either by reason of being afflicted with any of the diseases or mental or physical defects or disabilities mentioned in section 136 of this title, or otherwise, or whenever the Attorney General has received information showing that any aliens are coming from a country or have embarked at a place where any of said diseases are prevalent or epidemic, the Commissioner of Immigration and Naturalization, with the approval of the Attorney General, may direct that such aliens shall be detained on board the vessels bringing them, or in a United States immigration station at the expense of such vessel, as circumstances may require or justify, a sufficient time to enable the immigration officers and medical officers stationed at such ports to subject aliens to an observation and examination sufficient to determine whether or not they belong to the said excluded classes by reason of being afflicted in the manner indicated. In order to avoid undue delay in landing passengers or interference with commerce, the Commissioner of Immigration and Naturalization may, with the approval of the Attorney General, issue such regulations, not inconsistent with law, as may be deemed necessary to effect the purposes of this section. It shall be the duty of immigrant inspectors to report to the Commissioner of Immigration and Naturalization the condition of all vessels bringing aliens to United States ports. Feb. 5, 1917, c. 29, § 11, 39 Stat. 881; Ex.Ord.No. 6166, § 14, June 10, 1933; Reorg.Plan No. V, eff. June 14, 1940, 5 Fed.Reg. 2423, 54 Stat. 1238."

"§ 151. Inspection of alien passengers on arrival; temporary removal for examination

"Upon the arrival at a port of the United States of any vessel bringing aliens it shall be the duty of the proper immigration officials to go or to send competent assistants to the vessel and there inspect all such aliens, or said immigration officials may order a temporary removal of such aliens for examination at a designated time and place, but such temporary removal shall not be considered a landing, nor shall it relieve vessels, the transportation lines, masters, agents, owners, or consignees of the vessel upon which said aliens are brought to any port of the United States from any of the obligations which, in case such aliens remain on board, would under the provisions of this subchapter bind the said vessels, transportation lines, masters, agents, owners, or consignees. Where removal is made to premises owned or controlled by the United States, said vessels, transportation lines, masters, agents, owners, or consignees, and each of them, shall, so long as detention there lasts, be relieved of responsibility for the safe-keeping of such aliens. Whenever a temporary removal of aliens is made the vessels or transportation lines which brought them and the masters, owners, agents, and consignees of the vessel upon which they arrive shall pay all expenses of such removal and all expenses arising during subsequent detention, pending decision on the aliens' eligibility to enter the United States and until they are either allowed to land or returned to the care of the line or to the vessel which brought them, such expenses to include those of maintenance, medical treatment in hospital or elsewhere, burial in the event of death, and transfer to the vessel in the event of deportation, excepting only where they arise under the terms of any of the provisos of section 154 of this title: *Provided further*, That in cases of aliens who arrive in possession of unexpired visas issued by United States consuls within sixty days of the aliens' foreign

Most of the persons detained were "derivative citizens," that is, were persons born abroad, but of American parentage, who, under the applicable statutes, had citizenship and the right to enter the United States as citizens. The Government urges that, since the question of whether these persons were, in fact, of American parentage, had to be investigated, and their detention was necessary for the purpose of the investigation, they were, before their citizenship was verified, "aliens" within the meaning of the statute. We think there is merit in this argument.

The Immigration Act of 1894, 28 Stat. 372, 390, provided, in part:

"In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of the Treasury."

Persons of Chinese descent claiming derivative citizenship refused to submit to investigation of their citizenship by immigration officials. They gave their names and refused to answer further. Upon being detained, they sought to obtain their liberty by a writ of *habeas corpus*. The Supreme Court held that "The detention during the time necessary for investigation was not unlawful, even if all these parties were citizens of the United States". United States v. Sing Tuck, 194 U.S. 161, 169, 24 S.Ct. 621, 623, 48 L.Ed. 917. The Court further held that the entrants had to pursue the administrative appeal to the Secretary of the Treasury, although the Court refrained from deciding whether, thereafter, an appeal to the courts would lie upon their claim of citizenship.

The 1894 Act, like the 1917 Act here under construction, spoke only of aliens. In order to administer an act relating to aliens, the first thing an official must do is to ascertain which ones of a mixed group of entrants are aliens. He obviously cannot take each entrant's word for that. It may be necessary to detain the entrant, and, in the case of entrants such as those here involved, the investigation may have to be time consuming. If, as the 1917 Act authorized, the immigration officials directed that the entrant be detained on board the vessel, that detention would of course be at the expense of the carrier. In the Act of March 3, 1891, 26 Stat. 1084, Section 8, it was provided that the immigration officers might—

"order a temporary removal of such aliens for examination at a designated time and place, and then and there detain them until a thorough inspection is made. But such removal shall not be considered a landing during the pendency of such examination."

The concession to the owners of vessels, avoiding the tying up of the vessel during what might be a considerable period of detention, shifted the immediate costs of the maintenance of detained persons from the carrier to the Government, and said nothing about reimbursement of the Government by the carrier. The Immigration Act of March 3, 1903, 32 Stat. 1213, added:

"§ 16. * * * but such temporary removal shall not be considered a landing, nor shall it relieve the transportation lines * * * from any of the obligations which, in case such aliens remain on board, would, under the provisions of this Act, bind the said transportation lines".

Under this obviously ambiguous Act, the Circuit Court of Appeals for the Second Circuit held in United States v. Holland-American Line, 2 Cir., 212 F. 116,

embarkation, detention expenses and expenses incident to detention shall not be assessed against the vessel if the sole cause of exclusion is one arising under section 213(a) (1) or (3) of this title. Any refusal or failure to comply with the provisions hereof shall be punished in the manner specified in that section."

that the United States could not collect from the carrier the detention expenses, even of aliens. This decision was in 1914 affirmed by the Supreme Court without opinion by a 4 to 4 decision.

Then came the Act of 1917, here subject to construction. Its Section 15 which we have quoted, cleared up the ambiguity as to whether the carriers should reimburse the United States for the detention of "aliens" after they had been removed from vessels. It will be remembered that thus far no question had been raised as to any distinction between aliens and persons suspected to be aliens, but who turned out to be citizens, so there was no reason for Congress to advert particularly to that point.

From the enactment of the 1917 Act the immigration authorities, with the acquiescence of the carriers, including that of the plaintiff from the year 1927, imposed the charges of the type here sued for. No serious protest seems to have been made until about 1950. This is strong evidence of the reasonableness of the Government's interpretation of the 1917 Act.

■ Looking again at the Act itself, it is plain that the duty imposed upon the immigration officials by Section 15 "to go * * * to the vessel and there inspect all such aliens" is a duty to inspect everyone on board to ascertain whether or not he is an alien. One cannot lock the door of his cabin and answer the inspector's knock by saying, "I am a citizen, and you have no authority to interview me. I have read your statute and it authorizes you only to inspect aliens." Such a person would have read the statute too literally. United States v. Sing Tuck, supra. But once we concede that, we have broken down the meaning of the word "alien" for the purposes of the Act of 1917, and are asked by the plaintiff to say that, while it includes citizens suspected of being aliens for the purposes of inspection, detention on the vessel and removal for detention on land, its meaning shifts, within the confines not only of a single paragraph, but of a single sentence, as to its application to the expenses of detention. This would be an extraordinary feat of interpretation, and it is not surprising that it did not occur to the carriers who paid these charges until more than thirty years after they first read the statute.

■ Our conclusion is that the charges were not unlawfully imposed, and that the plaintiff is not entitled to recover. The Government's motion for a summary judgment is granted, and the plaintiff's petition is dismissed.

It is so ordered.

LITTLETON, Judge, and JONES, Chief Judge, concur.

LARAMORE, Judge.

I concur in the result of the majority opinion of this court. However, I believe the basic question in this case is one of jurisdiction. The claim rested upon payments alleged to have been made under duress because of the wrongful acts of officials of the United States Government acting without authority in law in coercing the claimant to pay the sums demanded. The exactions, when paid under duress and involuntarily, resulted from illegal, wrongful, and tortious acts of the defendant. Thus plaintiff's case and the case of United States v. Holland-America Line, 254 U.S. 148, 41 S.Ct. 72, 65 L.Ed. 193, are in all substantial respects parallel.

The apparent hardship of this case presents a strong appeal to me to indemnify the suffering individual at the expense of the United States. However, regardless of which direction you turn the cold fact that the Government agents were wrong in collecting the exactions meets the eye. If the acts of the Government were wrong, this action would sound in tort, and I reluctantly hold that under such circumstances this court would not have jurisdiction and the plaintiff could not recover under the decision of the Holland-America case, supra.

I believe plaintiff's motion for summary judgment should be overruled and de-

fendant's motion for summary judgment sustained.

WHITAKER, Judge (dissenting).

I agree that we have jurisdiction in this case because under the Judicial Code, approved March 3, 1911, and under the 1948 revision thereof, 28 U.S.C. § 1491, this court has jurisdiction of a claim founded upon an Act of Congress. The 1911 Act gave this court jurisdiction of "all claims (except for pensions) founded upon the Constitution of the United States or any law of Congress * * *." The 1948 revision gave it jurisdiction of "any claim against the United States * * * (2) Founded upon any Act of Congress". There is, of course, no substantial difference in the two Acts.

I do not think there can be any doubt that this case is founded upon an Act of Congress. It involves an interpretation of the Immigration Act of February 5, 1917, 39 Stat. 811. The Commissioner of Immigration thought that under that Act he had the right to assess carriers with detention expenses of immigrants who turned out to be citizens, and he issued regulations accordingly. The plaintiff says the Act did not authorize the assessment of detention expenses in the case of people who turned out to be citizens.

The regulation of the Commissioner of Immigration is valid only if it is authorized by an Act of Congress. Consequently, the question before the court is the proper interpretation of that Act. Does the Act authorize the assessment against the carriers of these expenses in the case of citizens, or does it not? Since the controversy is over the proper interpretation of an Act of Congress, plaintiff's claim is certainly "founded upon an Act of Congress."

We went into this matter in detail in the case of Clapp v. United States, 117 F.Supp. 576, 127 Ct.Cl. 505 in which decision I then concurred, and in which I now concur.

I do not agree that plaintiff is not entitled to recover, for the reason that there is no authority of law for the assessment against carriers of the expense of detention of persons arriving in this country who claim to be citizens and who turn out to be citizens.

The Act of February 5, 1917, 39 Stat. 881, authorizes the assessment against the carrier of such expenses only in the case of aliens. It does not authorize such assessment in the case of citizens who are detained until their citizenship can be determined, or who are detained for any other reason.

The regulation of the Immigration and Naturalization Bureau providing for the assessment of detention expenses in such cases is an extension of the Act of February 5, 1917. It goes beyond the terms of that Act. It was not authorized by that Act and is, therefore invalid. No Bureau or Department can make laws. Congress did not see fit to authorize the assessment of expenses against the carriers in such cases, and it is beyond the power of any Bureau or Department to do so.

Notwithstanding the long continuance of assessments in such cases, when Congress finally came to reconsider the law applicable to the immigration and naturalization of aliens, it expressly prohibited the assessment of detention expenses in the case of citizens. See the Immigration and Nationality Act of June 27, 1952, 66 Stat. 163, effective December 24, 1952.

The majority opinion says that the acquiescence of the carriers in the assessment against them of these charges "is strong evidence of the reasonableness of the Government's interpretation of the 1917 Act."

I do not think the record justifies the statement that the carriers acquiesced in the assessment of these charges. In fact, it is silent as to whether or not other carriers made protest against it and sought to avoid it. However the record leaves no doubt that this plaintiff from the very beginning of its operations as an overseas carrier protest-

ed against the assessment of these charges. See affidavits of Jack P. Peak and John A. Paine.

I do not question the "reasonableness" of the charges; in fact, I think it was just as reasonable for the Government to assess such charges against the carrier in the case of a person of doubtful citizenship claiming admission to this country as it was in the case of an alien claiming admission; but that is beside the point. The point is: Did Congress authorize the assessment of such charges. If it did not, they cannot be assessed, however reasonable the assessment might be. It seems obvious to me that Congress did not authorize it.

I dissent because this is a government of laws, to be enacted by Congress, and not a government of bureaucratic decrees.

Defendant also says that this plaintiff acquiesced in these charges; in other words, it says that the payments were voluntary. This position cannot be justified under the authorities. See in particular Swift Co. v. United States, 111 U.S. 22, 4 S.Ct. 244, 28 L.Ed. 341; and United States v. Wilson, 168 U.S. 273, 18 S.Ct. 85, 42 L.Ed. 464. These cases are specifically in point. The same principle upon which the Swift and Wilson cases were decided also governs the decision in Baldwin v. Scott County Milling Co., 307 U.S. 478, 59 S.Ct. 943, 83 L.Ed. 1409. That principle is that where the Government insists upon payment as one authorized by law, and where severe penalties, either economic or legal, are incurred for nonpayment, the payment cannot be considered voluntary.

This case is submitted to us on the question of liability. In my opinion, our judgment should be that plaintiff is entitled to recover such amounts as it paid for detention expenses of immigrants who were later determined to be citizens, reserving judgment until the amount thereof can be determined.

For these reasons I respectfully dissent.