AEROLINEAS ARGENTINAS, Plaintiff,

v.

The UNITED STATES, Defendant.

PAKISTAN INTERNATIONAL AIRLINES, Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 92–9C, 92–481C.

United States Court of Federal Claims.

March 24, 1994.

Jay Henry Levine, Bigham, Englar, Jones & Houston and Mumtaz Hussain Alvi, New York City, for plaintiffs.

Thomas David Dinackus, U.S. Dept. of Justice, Commercial Litigation Branch, Washington, DC, for defendant.

WEINSTEIN, Judge.

### Order[1]

Defendant has moved to dismiss the complaints of plaintiffs Aerolineas Argentinas and Pakistan International Airlines ("Aerolineas" and "PIA," respectively; "the airlines," collectively) for failure to state a claim over which this court has jurisdiction. After oral argument, the motions are granted.

1. This order originally was filed on December 22, 1993. The government requested publication. Therefore, the December 22 order is being reissued for publication, with minor revisions not affecting the substance of the decision.

*Facts*

When deciding a motion to dismiss, the court "must assume each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant." *Owen v. United States*, 851 F.2d 1404, 1407 (Fed.Cir.1988); *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

### *Aerolineas Argentinas v. United States*

On April 27, 1990, an Aerolineas plane arrived at John F. Kennedy Airport in New York City with, among others, six People's Republic of China passengers ticketed for Hong Kong who showed passports ostensibly from Singapore and Malaysia. They requested political asylum in the United States. An officer of the Immigration and Naturalization Service (INS) then issued a written order requiring Aerolineas to maintain custody of the asylum seekers and to produce them at their asylum hearings. On August 7, INS paroled the passengers into the United States, releasing them from Aerolineas's custody.

On March 22, 1991, two Chinese passengers en route to Canada landed at Kennedy Airport on an Aerolineas flight and requested political asylum. An INS officer then issued a written order requiring Aerolineas to maintain custody of the asylum seekers and to produce them at their hearings. On May 28, INS paroled the passengers into the United States.

Aerolineas provided hotel rooms, food, guards, and other services for the asylum applicants. In each case, Aerolineas asked the INS to take custody of the asylum applicants, to reimburse the airline for the expenses incurred detaining and caring for them, or to allow the applicants to enter the United States on parole.

Generally, aliens may not enter the United States without a United States visa, but passengers such as these, who are en route to another country, may, if they meet certain

conditions, enter the United States without a visa as part of their "immediate and continuous transit through the United States" to the other country. 8 C.F.R. § 212.1(f)(1); *see also* 8 C.F.R. § 214.2(c)(1). This process is known as "transit without visa," 8 C.F.R. § 212.1(f)(1), or "TWOV."

▪ The INS may prevent excludable aliens (including stowaways and persons who attempt to gain admission to the United States fraudulently or without proper documentation) from entering the country. *See* 8 U.S.C. § 1182(a)–(d). A TWOV who violates the TWOV requirements is excludable. Nationals of certain countries have been denied TWOV status. 8 C.F.R. § 212.1(f)(3).

Both airlines have entered into a Form I–426 Immediate and Continuous Transit Agreement with the INS. 8 C.F.R. § 238.-3(b) (listing signatories to the agreement). This agreement grants the airlines the right to land for refueling and servicing while carrying passengers without United States visas, so long as the passengers meet the regulatory requirements for TWOV passengers, including eligibility for United States immigration and documents evidencing their ability to enter the destination country, and the airlines guarantee that the passengers will in fact travel on to a third country.[2] The Form I–426 requires the carrier ("shall") "without expense to the government of the United States, [to] remove to the foreign port from which the alien embarked ... any alien ... found by the proper officials not to be eligible for passage through the United States in immediate and continuous transit."

Aerolineas filed suit in this court on January 7, 1992, seeking damages of $162,000 for the expenses incurred with regard to the first group of asylum seekers, and $60,000 for the second group.

*Pakistan International Airlines v. United States* [3]

On November 10, 1988, a TWOV passenger arrived in New York on a PIA flight without any travel documents (having destroyed his documents during the flight), and asked for political asylum. An INS officer then issued a written order requiring PIA to maintain custody of the asylum seeker, and produce him at his asylum hearing. The passenger remained in PIA's custody until he was paroled on May 3, 1989.

On January 27, 1989, a passenger en route to Canada arrived in New York on a PIA flight, and requested political asylum. He was similarly delivered into PIA's custody,

---

2. PIA also is a signatory to the Immediate and Continuous Transit Agreement (With Provision for Control of Uninspected Passengers at New York and In Transit Lounge Use) ("Transit Agreement") executed by PIA and the INS in 1988. The two agreements are, in pertinent part, equivalent. For ease of convenience, the court will hereinafter refer only to Form I–426, but the discussion applies with equal force to the Transit Agreement. PIA conceded as much at oral argument. Transcript at 48–49.

3. On December 9, 1992, PIA moved for leave to amend its complaint, and attached a copy of the proposed amended complaint to the motion. The motion was granted on February 2, 1993, but PIA never filed the amended complaint. Because an amendment is not effective until the amended complaint is filed with the court, *Donner v. Sulcus Computer Corp.*, 103 F.R.D. 548, 549 (N.D.Ga.1984), the court only has before it PIA's original complaint.

The court notes, however, that the proposed amendments would not affect the outcome of the pending motion. Pakistan sought to amend its complaint to 1) add a number of "background facts," almost all of which are actually legal conclusions about INS policy; and 2) attach copies of the two transit agreements between it and the INS.

The first addition is unavailing, because the court does not assume the truth of legal conclusions when it decides a motion to dismiss. *E.g.*, *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Frederiksen v. Poloway*, 637 F.2d 1147, 1150 n. 1 (7th Cir.), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *see* 2A James W. Moore et al., *Moore's Federal Practice* ¶ 12.07[2.–5] (1993).

The second addition is unnecessary in this instance, because the agreements already are before the court, having been attached to various submissions by both parties, and the court may consider evidentiary matters outside the pleadings when deciding a motion to dismiss for lack of subject matter jurisdiction. *Indium Corp. of Am. v. Semi–Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir.1985). The court will consider the agreements, because they are integral to the complaint, and the parties have undisputed notice of their contents. *See Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

where he remained until he was paroled on March 25, 1989.

This scene was repeated on November 2, 1989. The asylum seeker was delivered into PIA's custody, where he remained until paroled on May 25, 1990.

Between late 1989 and early 1990, four other TWOV passengers destroyed their travel documents en route to New York, and requested political asylum upon their arrival. INS delivered each into PIA's custody, where they remained until they were paroled on October 8, 1990.

On March 8, 1992, a PIA flight arrived at Kennedy Airport with, among others, three Lebanese passengers ticketed for Venezuela, and a Somali passenger en route to Canada. Each requested political asylum. An INS officer then issued a written order requiring PIA to maintain custody of the asylum seekers and to produce them at their asylum hearings. The Lebanese passengers escaped from PIA's custody on March 31; the Somali escaped on April 17.

PIA provided hotel rooms, food, guards, and other services for each asylum applicant. In each case, PIA asked the INS to take custody of the asylum applicants, to reimburse the airline for the expenses incurred detaining and caring for them, or to allow the applicants to enter the United States on parole.

PIA filed suit in this court on July 14, 1992, seeking reimbursement for expenses in the following amounts: $89,340.54 for the first individual; $51,834.81 for the second individual; $50,000 for the third individual; $262,269.87 for the first group; and an undetermined amount for the second group.

## Discussion

The airlines assert that each clause of the Tucker Act, which gives the court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort," 28 U.S.C. § 1491(a)(1), authorizes the court to hear these claims.

## Statute

In 1986, Congress amended the Immigration and Nationality Act to create an immigration user fee. Pub.L. No. 99–500, § 205, 100 Stat. 1783, 1783–53 (1986) (codified at 8 U.S.C. § 1356(d)–(k)). The Immigration User Fee Statute imposed a $5 user fee, to be collected by airlines and other transportation lines and then remitted to the government, 8 U.S.C. § 1356(f), "for the immigration inspection of each passenger arriving at a port of entry in the United States, or for the preinspection of a passenger in a place outside of the United States prior to such arrival, aboard a commercial aircraft or commercial vessel," 8 U.S.C. § 1356(d). The proceeds from these fees, and from civil fines imposed on transportation companies who bring excludable aliens into the United States, see 8 U.S.C. § 1356(h)(1)(B), are kept in a separate account within the general fund of the United States Treasury. 8 U.S.C. § 1356(h)(1)(A). The money is to be disposed of as follows:

> The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General in providing immigration and preinspection services for commercial aircraft or vessels and in—
>
> .     .     .     .     .
>
> (v) providing detention and deportation services for excludable aliens arriving on commercial aircraft and vessels.

8 U.S.C. § 1356(h)(2)(A).

The final regulations under the statute excepted an "alien who is presented as a . . . [TWOV] passenger" from the INS's responsibility to assume custody of excludable aliens. 8 C.F.R. § 235.3(d).

The airlines concede that the transit agreements contemplate payment of delay-on-return expenses of TWOV passengers, but contend that detention for asylum processing was *not* contemplated. The airlines note that the statute, 8 U.S.C. § 1356(h)(2)(A)(v),

calls for the fees to be used for "detention and deportation services," and that 8 U.S.C. § 1356(g) states that "the immigration services required to be provided to passengers upon arrival in the United States on scheduled airline flights shall be adequately provided ... at no cost (other than the fees imposed under subsection (d) of this section) to airlines and airline passengers."[4] From these provisions, the airlines conclude that 8 U.S.C. § 1356 requires the government to pay for the detention of any excludable alien who seeks political asylum after arriving in the United States without a visa, and relieves the transportation line of any responsibility for such services.[5]

■■■ There are two types of situations where a statute supports jurisdiction in this court.

[T]he non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regula-

tion. In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum.

*Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967). The airlines contend that they have stated claims of both classes.[6]

## Illegal Exaction

■ PIA argues that it has stated a claim of the first type, for money paid to the government "directly or in effect, ... in contravention of ... a statute." *Id.* It relies on *Pan American World Airways v. United States*, 122 F.Supp. 682, 682–83, 129 Ct.Cl. 53 (1954), where the plaintiff sought to require the INS to refund the amounts plaintiff had reimbursed the INS for detention services provided by the INS. The opinion is not precise about the grounds on which jurisdiction was based, *see id.* at 683–84, but it is now seen as an illegal exaction case. *See, e.g., Eastport S.S. Corp. v. United States*, 372 F.2d at 1007 n. 6; *South P.R. Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 626, 167 Ct.Cl. 236 (1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965); *Northern Indian Housing & Dev. Council v. United States*, 12 Cl.Ct. 417, 420 (1987).

PIA argues

---

4. The airlines cite legislative history indicating that Congress, by enacting this statute, intended to relieve airlines of the costs of detaining all excludable aliens, *see* H.R.Conf.Rep. No. 1005, 99th Cong., 2d Sess. 421 (1986), and thus that the regulations thereunder permitting the airlines to be charged for the expenses of TWOV passengers, *see* 8 C.F.R. §§ 235.3(d), 238.3(c), are invalid.

5. The government characterizes the statute as a revenue and bookkeeping law.

6. This court has no jurisdiction to invalidate the regulations authorizing the INS to require detention expenses of TWOV passengers to be paid by the carriers, nor to enforce the government's compliance with the requirements of 8 U.S.C. § 1356(g) that immigration services for all excludable aliens be provided at no cost to airlines (assuming *arguendo* the statute so requires). These claims fit within neither category of statutory claim, and also would require the court to

grant injunctive relief, which is beyond this court's statutory authority. *Bowen v. Massachusetts*, 487 U.S. 879, 905 & n. 40, 108 S.Ct. 2722, 2737–38 & n. 40, 101 L.Ed.2d 749 (1988); *United States v. King*, 395 U.S. 1, 3–4, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 866–67, 96 L.Ed. 1153 (1952) (proper forum for challenging legality of Presidential action is through an action for injunctive relief in the district courts).

Further, a court must defer to an agency's reasonable interpretation of the statute it is charged with administering. *E.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). The court cannot conclude that it is unreasonable for the INS to distinguish between TWOV passengers and non-TWOV excludable aliens.

The only difference between this case and *Pan Am* is that in *Pan Am* the government itself detained the passengers and ordered the carriers to cover the cost of detention, whereas in this case the government ordered the carriers to arrange and pay for the passengers' detention.... There is no principled basis to distinguish between *Pan Am* and this case on jurisdictional grounds.

Plaintiff's Supplemental Post Conference Memorandum of Law, at 2–3.

In fact, there is a principled basis for distinguishing *Pan Am*. Illegal exaction claims, as cases of this class are known, *see, e.g., Montego Bay Imports, Ltd. v. United States,* 10 Cl.Ct. 806, 810 (1986), require that *money* have been paid over to the government "directly or in effect." *Eastport Steamship Corp.,* 372 F.2d at 1007. "The phrase 'in effect' has only been interpreted in illegal exaction cases to mean that the plaintiff, who directly gave the government property, 'in effect' gave *money* to the defendant." *Clevenger Roofing & Sheet Metal Co. v. United States,* 8 Cl.Ct. 346, 352 n. 6 (1985) (emphasis added and omitted). Because no money or property was paid over to the government in this case, *Pan Am* provides no basis for asserting jurisdiction.

In *Clevenger Roofing,* a government subcontractor sued the United States for the return of funds withheld by the prime contractor. The prime contractor had withheld the funds to recoup back pay it paid some of the subcontractor's employees, pursuant to a wage classification by the Department of Labor. *Id.* at 350. The subcontractor argued that the wage classification was an illegal exaction of the withheld funds; the Claims Court granted the defendant's motion to dismiss, because the funds were not directly "paid" to the government but, rather, to the prime contractor:

> Plaintiff has not cited to the court, nor could the court find, any case where this court (or its predecessor) took jurisdiction to determine the merits of an alleged illegal exaction where the money or property was *not* directly taken from the plaintiff by

the government. Although the plaintiff argues here that "nothing in the case law dealing with the recovery of ... illegally exacted funds [by the government] suggests that, for a party to recover such funds, it must be shown that the funds were exacted directly from the injured party," the short answer to that contention is that the burden to so show is on the plaintiff, which has not been met. On these facts, therefore, the court will not expand its jurisdiction, which must be narrowly construed, to include an arguable indirect exaction by the defendant....

*Id.* at 353 (citations omitted); *accord W.R. Cooper Gen. Contractor v. United States,* 12 Cl.Ct. 406, 409 (1987), *vacated on other grounds,* 843 F.2d 1362 (Fed.Cir.1988).

Similarly, the plaintiffs here have not alleged that they provided any funds or other property directly to the government; instead, they seek reimbursement for funds paid for and to third parties. *See City of El Centro v. United States,* 922 F.2d 816, 821–23 (Fed.Cir.1990) (INS received no benefit from medical care provided to illegal aliens), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). Because no money or property was taken directly from the airlines, they have not stated a claim for illegal exaction.[7]

*Statute Mandating Money Payment*

The airlines also argue that they have stated claims of the second type, *i.e.,* that they "are entitled to a payment from the treasury," because 8 U.S.C. § 1356 "grants [them], expressly or by implication, a right to be paid a certain sum." *Eastport S.S. Corp. v. United States,* 327 F.2d at 1007.

"[T]he asserted entitlement to money damages depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976) (quoting *Eastport S.S. Corp. v. United States,* 327 F.2d at 1009); *accord United States v. Mitchell,* 463 U.S.

---

7. The argument that plaintiffs should be compensated for *services* provided *for the benefit* of the government is a contractual (or quasi-contractual) argument, which is addressed *infra,* at 36–37.

206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983).

The only entity to which the Immigration User Fee Statute directs any payment from the federal treasury is the Attorney General of the United States. 8 U.S.C. § 1356(h)(2). (The INS, like the Attorney General's office, is part of the Department of Justice. 8 U.S.C. § 1551.) Since the statute only provides for a transfer of funds within the federal government, it "cannot be held to command, on itself, payment of money to a claimant." *Dos Santos v. United States*, 19 Cl.Ct. 681, 686 (1990).

■ Moreover, a plaintiff cannot ground jurisdiction in this court upon a statute that mandates the payment of money to someone else. *See Clevenger Roofing & Sheet Metal Co. v. United States*, 8 Cl.Ct. at 353–54; *see also United States v. Testan*, 424 U.S. at 405–07, 96 S.Ct. at 956–58; *cf. Bowen v. Massachusetts*, 487 U.S. 879, 905 n. 42, 108 S.Ct. 2722, 2738 n. 42, 101 L.Ed.2d 749 (1988) ("Statutes that have been 'interpreted as mandating compensation by the Federal government for the damages sustained' generally are provisions such as the Back Pay Act[, which] ... attempt to compensate *a particular class of persons* for past injuries or labors.") (citations omitted) (emphasis added).

Finally, the regulation excluding detention of TWOV passengers from the ambit of 8 U.S.C. § 1356 also establishes that the law does not mandate the payment of money to plaintiffs under these circumstances. *See Hambsch v. United States*, 857 F.2d 763, 764–65 (Fed.Cir.1988) (regulations showed that statute regarding administrative sick leave was discretionary, and therefore not money-mandating), *cert. denied*, 490 U.S. 1054, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989); *Shelleman v. United States*, 9 Cl.Ct. 452, 456 (1986).

Plaintiffs do not argue that any statute other than 8 U.S.C. § 1356 provides a basis for jurisdiction. Because 8 U.S.C. § 1356 cannot fairly be interpreted as mandating compensation for a carrier's detention expenses, the court cannot base jurisdiction over the airlines' claims on that statute.

### Constitution

■ The airlines argue that by ordering them to pay the detention expenses of these TWOV passengers at their own cost, the INS effected a regulatory taking for which the airlines are due compensation. Specifically, they contend that the INS took their money [8] by making them provide services to TWOV passengers who became excludable aliens, the law required the INS itself to provide detention services for all excludable aliens, and that these services, in fairness, should be paid for by the public as a whole.[9]

■ If, as plaintiffs argue, the INS was not authorized to make them detain and pay

---

8. PIA also argues that its rights under the two transit agreements, *see supra* note 1, were taken. The current discussion applies with equal force to those claims. (The contractual arguments are addressed *infra*, at 35.)

9. The "fairness" argument obviously provides no independent basis for relief. This court, being a court of limited jurisdiction and having no general equity jurisdiction, can neither entertain a case merely to grant equitable relief nor rewrite a statute, regulation, or government contract to effectuate a result the court may consider to be more "fair" than what that statute, regulation, or contract provides. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 2178–79, 100 L.Ed.2d 811 (1988).

Those passengers who have tickets for a third country are deemed to arrive in the United States under the TWOV arrangement. Those passengers who destroy their tickets are deemed by the INS to be stowaways. PIA makes no arguments relevant to this court's jurisdiction which relate solely to stowaways, and the issues addressed in this opinion cover detention of both types of asylum seekers (except the express contract arguments, *infra* at 35, which relate only to TWOV passengers). Rather, it concedes that both passengers without proper documentation and "stowaways" are excludable aliens under applicable law.

PIA makes the equitable argument that it is virtually impossible for the carrier to prevent the passenger from destroying documents or to prove that the passenger was properly boarded. However, the INS provided guidance that dealt with such problems, by presuming proper boarding and no stowaway status if there was "reasonable diligence" by the carrier at the port of embarkation, which the carrier may show by "photocopying the documents and tickets of persons who are profiled as possible violators." *INS Operations Cable: Stowaways on Commercial Airline Flights*, at 10 (Dec. 19, 1989).

the detention expenses of these passengers, then no taking can have occurred. *Florida Rock Indus. v. United States*, 791 F.2d 893, 898–99 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *Shelden v. United States*, 19 Cl.Ct. 247, 252 (1990), *vacated on other grounds*, 26 Cl.Ct. 375 (1992). "[T]akings can be found in the government's *valid* use of its regulatory process," *Montego Bay Imports, Ltd. v. United States*, 10 Cl.Ct. at 809 (emphasis added); "[t]he Tucker Act suit in the Claims Court is not, however, available to recover damages for unauthorized acts of government officials." *Florida Rock Indus. v. United States*, 791 F.2d at 898; *accord Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802–03 (Fed.Cir.1993).

▮ Even if the challenged actions were authorized, *see* 8 C.F.R. §§ 235.3(d), 238.-3(c),[10] the airlines have not stated a takings claim. The court in *Atlas Corp. v. United States*, 895 F.2d 745 (Fed.Cir.1990), a challenge to a statute making uranium producers responsible for cleaning up their mill tailings, set out certain standards for determining whether a regulatory taking of property has occurred.

> Three factors have "particular significance": (1) the character of the government action; (2) the economic impact of the regulation on the plaintiff; and (3) the extent to which the regulation has interfered with distinct investment-backed expectations. It is not necessary in every case to undertake an evidentiary hearing on the issue of whether a taking has occurred. Summary dismissal of a taking claim is appropriate where the circumstances alleged in the complaint, even if taken as true and all reasonable inferences are drawn in favor of the plaintiff, cannot establish that a taking has occurred.

*Id.* at 757 (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986)); *accord Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust*, —— U.S. ——, —— – ——, 113 S.Ct. 2264, 2290–91, 124 L.Ed.2d 539 (1993); *Hendler v. United States*, 952 F.2d 1364, 1372, 1375 (Fed.Cir. 1991).

The *Atlas* court concluded that the first factor, the character of the challenged action, weighed against the statute constituting a taking. "[T]he regulatory requirement to spend money for tailings stabilization and mill decommissioning ... does not invade or permanently appropriate [plaintiff's] property for public use." *Atlas Corp. v. United States*, 895 F.2d at 757.

In *Connolly [v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986),] the Supreme Court considered a statute that required employers withdrawing from a pension plan to pay into the plan an additional amount corresponding to the employer's proportionate share of the plan's unfunded vested benefits. The Court held that the requirement to pay an amount greater than that which the employer was contractually obligated to pay was not a taking. The Court stated that "[t]his interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation."

The uranium tailings were created by [plaintiff's] production of uranium. Congress has determined that those tailings are potentially hazardous to the public health. Pursuant to Congress' power to protect the general health, safety, and welfare, Congress has now required [plaintiff] to stabilize the tailings it has created. Such government action does not constitute a "taking."

---

10. 8 C.F.R. § 235.3(d) provides

The Service will assume custody of any alien [who appears to the inspecting officer to be inadmissible], except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger.

8 C.F.R. § 238.3(c), which addresses Form I-426, provides

Nothing contained within the provisions of section 286 of the Act [8 U.S.C. § 1356] shall be deemed to waive the carrier's liability for detention, transportation, and other expenses incurred in the bringing of aliens to the United States under the terms of this section.

*Atlas Corp. v. United States,* 895 F.2d at 757–58 (quoting *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. at 225, 106 S.Ct. at 1026).

The same is true of the regulation requiring the airlines to incur detention expenses for TWOV passengers. *See* 8 C.F.R. §§ 235.3(d), 238.3(c). Requiring them to pay for detention services does not invade or appropriate their property. *See id.* at 756 ("Requiring money to be spent is not a taking of property."). At most, it merely interferes with their property rights pursuant to a public program intended to promote the common good—in this case, the TWOV program, which facilitates the international passage of airline passengers while securing the borders of the United States from illegal entry. *See* 8 U.S.C. § 1228(a), (c); 8 C.F.R. §§ 212.1(f), 214.2(c); *see also United States v. Kavazanjian,* 623 F.2d 730, 732 (1st Cir.1980).[11]

Indeed, it is not clear a "right" to bring TWOV passengers to this country or to bring TWOV passengers without adequate documentation (excludable aliens) is a "property right" at all. *Cf. Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 55, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986) (state's right to withdraw from statutory scheme was not vested property interest that was taken when Congress amended Social Security system to restrict such withdrawal right; the government's power to decide when a license may be issued also necessarily implies the power to determine the circumstances for its revocation).

11. The Supreme Court's recent decision in *Concrete Pipe & Products, Inc. v. Construction Laborers Pension Trust,* ── U.S. ──, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), supports the government's arguments that the regulation here does not constitute a regulatory taking. The Court in *Concrete Pipe,* quoting *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026, held that a challenged statute did not violate the Takings Clause when the government "does not physically invade or permanently appropriate any of the [plaintiff's] assets for its own use," *Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust,* ── U.S. at ──, 113 S.Ct. at 2290, and noted that a "mere diminution" in the value of property or of a company's net worth "is insufficient to demonstrate a taking," *id.* at ──, 113 S.Ct. at 2291

The second factor in *Atlas,* the economic impact on the claimant, also indicates that a taking has not occurred.

> Even though [the statute] will require [plaintiff] to spend large amounts of money to stabilize the uranium tailings and [plaintiff] may be completely deprived of the use of that money, the financial burden of the Act cannot be considered in a vacuum.... [Plaintiff] has *not* claimed that the government has interfered with its production of uranium or has made the use of its mill unprofitable. The allegations [plaintiff] has made do not show any economic impact that would support a determination that a "taking" has occurred.

*Atlas Corp. v. United States,* 895 F.2d at 758. Nor have the airlines made any allegation that they have been completely deprived of their economic rights to conduct their business profitably.[12]

Finally, the court finds no interference with investment-backed expectations, the third test in *Atlas:*

> From the outset of the uranium procurement program, the nuclear industry has been highly regulated.... "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." The only "expectation" [plaintiff] could have under the circumstances it has alleged is that it would not have to spend its own money to remediate health and environmental hazards created by its production of uranium. Such an expectation cannot be a reasonable commercial expectation.

(citing, *e.g., Hadacheck v. Sebastian* 239 U.S. 394, 405, 36 S.Ct. 143, 143–44, 60 L.Ed. 348 (1915) (holding that a 92.5% diminution did not establish a taking)).

12. Plaintiffs do not argue that the cost of providing detention facilities for such travellers outweighs the benefit of being permitted to carry such passengers into the United States. *See* Transcript at 56–59. Nor do they deny that such costs could be minimized by more stringent precautions by the airlines upon boarding such passengers. *See supra,* note 8. (Thus, it appears that the regulatory arrangement is highly efficient, since the party in the best position to minimize the risk or cost is the one with the most incentive to do so, since it will bear the cost.)

*Id.* (quoting *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. at 227, 106 S.Ct. at 1027 (quoting *FHA v. The Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)) (internal quotation marks omitted)).

The same is true in the present case. Immigration and aviation are highly regulated fields. The airlines had notice, in light of the statutes, regulations, and agreements under which they brought these passengers to the United States, that they could be required to spend their own money to ensure their passengers' compliance with United States immigration controls, and, indeed, that the statutes and regulations could be amended, and that the Form I–426 Agreement could be revoked or modified at any time.[13] *Chang v. United States,* 859 F.2d 893, 897 (Fed.Cir. 1988) ("a valid governmental exercise of its constitutional power to regulate commerce with foreign nations can have the consequential effect of altering the obligations of preexisting contracts without giving issue to a taking") (citing *Knox v. Lee,* 79 U.S. (12 Wall) 457, 551, 20 L.Ed. 287 (1870) (footnote omitted)). They made a business decision to risk incurring costs of such detention as the price of carrying passengers without visas.

The nature of the action, its impact on the airlines, and the airlines' reasonable investment-backed expectations each indicate that no taking has occurred here. Thus, plaintiffs have not stated a claim for a taking for which compensation is now due.

*Contract*

*Express Contract*

■ The airlines contend that ordering them to detain passengers breached the INS's agreement under Form I–426,[14] which allows the airlines to land passengers without visas provided they guarantee that the passengers will continue on to a third country, because the agreement does not require them to pay such expenses and only provides for five hundred dollars in liquidated dam-

ages for each passenger not proceeding in immediate and continuous transport.

Defendant argues that Form I–426 is not a contract upon which jurisdiction in this court may be based.

> The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds. The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves.

*Kania v. United States,* 650 F.2d 264, 268, 227 Ct.Cl. 458 (1981). "[C]ontracts made by Government officials in the implementation of a sovereign function are not amenable to suit in the Claims Court; on the other hand, contracts made in situations where the Government enters the market place in a proprietary capacity are subject in this court to claims for breach." *Town of N. Bonneville, Wash. v. United States,* 5 Cl.Ct. 312, 320 (1984), *aff'd in part and rev'd in part without op.,* 833 F.2d 1024 (Fed.Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988); *see United States v. Citizens & S. Nat'l Bank,* 889 F.2d 1067, 1069 (Fed.Cir.1989); *D.R. Smalley & Sons, Inc. v. United States,* 372 F.2d 505, 507, 178 Ct.Cl. 593 (1967).

There is nothing proprietary about Form I–426. The INS acquired no property or services thereunder; indeed, the agency derives no economic benefit at all from the agreement. *See City of El Centro v. United States,* 922 F.2d 816, 821–23 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *cf. Kentucky, Natural Resources & Envtl. Protection Cabinet v. United States,* 27 Fed.Cl. 173, 179–80 (1992). Any economic benefit in the form of detention services is derived from the regula-

---

**13.** The Form I–426 Agreement expressly provides that it may be cancelled by either party upon 10 days notice.

**14.** PIA also relies on the Transit Agreement. *See supra,* note 1.

tion excluding TWOV passengers from the statutory requirement for the INS to pay detention expenses, 8 C.F.R. § 253.3(d).

The TWOV agreement was entered into to facilitate the international passage of airline passengers while securing the borders of the United States from illegal entry. *See* 8 U.S.C. § 1228(a), (c); *United States v. Kavazanjian,* 623 F.2d at 732. As such, it is a sovereign act, "a public and general act for the general good" not amenable to suit in this court, *Tony Downs Foods Co. v. United States,* 530 F.2d 367, 370, 209 Ct.Cl. 31 (1976); *cf. Air Terminal Servs., Inc. v. United States,* 330 F.2d 974, 980, 165 Ct.Cl. 525 *cert. denied,* 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964). While the initial basis for the regulatory requirement that the airlines pay the detention expenses of TWOV passengers is stated to be the transit agreements, those agreements do not expressly require either that the airlines pay the expenses, or, more importantly, that the government reimburse them if they do pay. Thus, the court lacks jurisdiction over the airlines' express contract claims.

Also, the Form I–426 agreement is not a contract for the payment of monies by the United States but, rather, in effect, a revocable license. Indeed, the only party required by the agreement to pay out money is the airline.

*Implied Contract*

Aerolineas also contends that jurisdiction may rest upon either of two implied contracts.

First, Aerolineas argues that the INS orders to detain the passengers created implied-in-fact contracts to compensate the airline for its expenses.

■ An implied-in-fact contract requires showings of all of the elements of an ordinary written contract—consideration, mutuality of intent to contract, definiteness of terms, and authority to bind the government on the part of the official whose conduct is relied upon. *Girling Health Sys. v. United States,* 949 F.2d 1145, 1147 (Fed.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1483, 117 L.Ed.2d 626 (1992); *City of El Centro v. United States,* 922 F.2d at 820 (rejecting a

similar claim regarding medical care provided to aliens).

■ Moreover, under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.,* this contract claim would have to be certified and submitted to the contracting officer for decision before suit could be filed in this court. *City of El Centro v. United States,* 17 Cl.Ct. 794, 799 (1989), *rev'd on other grounds,* 922 F.2d 816 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *see Heyl & Patterson, Inc. v. O'Keefe,* 986 F.2d 480, 485 (Fed.Cir.1993) (certification is a jurisdictional prerequisite for contract claims over $50,000); 41 U.S.C. §§ 602, 605(a), 605(c)(1), 605(c)(5), 609. Aerolineas's complaint does not allege that any of these requirements was satisfied.

■ The mere receipt of such services, even if these benefitted the government, would not create an implied-in-fact contract to pay for them, but only a quasi-contract, based on *quantum meruit.* This court has no jurisdiction over such quasi-contracts. *See Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Fincke v. United States,* 675 F.2d 289, 296–97, 230 Ct.Cl. 233 (1982).

■ Second, Aerolineas contends that it is a third-party beneficiary of an implied contract between the government and the passengers for the provision of detention services. Even assuming that such a contract existed (and Aerolineas proffers nothing to support this allegation), Aerolineas has not alleged or proffered evidence to show that it is an intended third-party beneficiary.

In order for one to have the recognized status of a third-party beneficiary to a government contract to which it is not a party, the contract with the government must evidence not only a *clear* intention to confer a benefit to that third party, but also an intention to give that third party the right to maintain an action against the government in order to protect the resulting benefit.

*Thomas Funding Corp. v. United States,* 15 Cl.Ct. 495, 500 (1988); *accord Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 697–98,

1980 WL 13154 (1980); *see also Fireman's Fund Ins. Co. v. United States* 909 F.2d 495, 499–500 (Fed.Cir.1990).

Accordingly, the airlines have not stated a claim for breach of an implied contract.

*Damages Not Sounding in Tort*

■ Finally, Aerolineas argues that the court has jurisdiction over claims for expenses incurred detaining aliens under the final clause of 28 U.S.C. § 1491(a)(1), which authorizes claims "for liquidated or unliquidated damages in cases not sounding in tort." It relies on this statement in *Pan Am:*

> When Congress, having expressly given this court jurisdiction of claims "founded upon any express or implied contract with the United States[,"] in the very next clause gave the court jurisdiction over claims "for liquidated or unliquidated damages in cases not sounding in tort," it must have supposed that there are non-contractual claims which do not sound in tort. We suggest that the type of claim here involved may be one of them.

*Pan Am. World Airways v. United States,* 122 F.Supp. 682, 683–84, 129 Ct.Cl. 53 (1954); *see also Clapp v. United States,* 117 F.Supp. 576, 581, 127 Ct.Cl. 505 (1954) (making a similar suggestion).

The court rejects this argument. Aerolineas has not cited, and the court is not aware of, any decision acting on these suggestions, which are dicta because jurisdiction was properly grounded, in each case, on an allegedly illegal exaction. *South P.R. Sugar Co. Trading Corp. v. United States,* 334 F.2d 622, 626, 167 Ct.Cl. 236 (1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965); *see Pan Am. World Airways v. United States,* 122 F.Supp. at 682; *Clapp v. United States,* 117 F.Supp. at 578.

Moreover, if, as the airlines argue, INS officials exceeded their authority by ordering them to detain these passengers, then the claim does sound in tort. *United States v. Nederlandsch–Amerikaansche Stoomvaart Maatschappij,* 254 U.S. 148, 153, 41 S.Ct. 72, 73, 65 L.Ed. 193 (1920); *Huerta v. United States,* 548 F.2d 343, 348, 212 Ct.Cl. 473 (1977).

Even if the claim does not sound in tort, it fails because Aerolineas has not identified any source of its substantive right to recover money independent of the Tucker Act. *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980); *United States v. Testan,* 424 U.S. 392, 398–400, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *see United States v. Cornell S.B. Co.,* 202 U.S. 184, 190, 26 S.Ct. 648, 649–50, 50 L.Ed. 987 (1906) (claim for maritime salvage).

The court does not have jurisdiction in this case under this theory.

*Conclusion*

For the reasons stated above, the motions to dismiss are granted. The clerk is ordered to dismiss both complaints.