102 U.S. 322
 102 U.S. 322
 26 L.Ed. 181
 CLARK
v.
UNITED STATES.
 October Term, 1880
 
 1
 APPEAL from the Court of Claims.
 
 
 2
 This is a suit by James S. Clark and Edward Fulton, partners under the name and style of J. S. Clark & Co., to recover from the United States the sum of $10,000 alleged to have been extorted from the petitioners in December, 1864, by Col. Harai Robinson, then acting provost-marshal-general for the Department of the Gulf.
 
 
 3
 The court below found the following facts:—— I. On the 26th of October, 1864, the Secretary of the Treasury signed and delivered to the claimants the paper of that date, annexed to the petition; and on the same day Abraham Lincoln, President of the United States, signed the order of that date, accompanying said paper, and also annexed to the petition.
 
 
 4
 II. On the 16th of November, 1864, the claimants delivered to George S. Denison, the acting collector of customs at New Orleans, a bond, duly executed, with proper and sufficient sureties, in the sum of $250,000, as required by the aforesaid paper signed by the Secretary of the Treasury.
 
 
 5
 III. On the 13th of December, 1864, on the United States ship 'Choctaw;' off Bayou Sara, La., John J. Cornwell, lieutenant-commander of the United States navy, commanding the second and third districts of the Mississippi River, issued the following order, addressed to naval officers between Bayou Sara and New Orleans: 'Pass the steamer 'Sciota,' Captain Owesney, with a cargo of three hundred and thirty-six (336) bales of cotton, to New Orleans, without molestation. The cotton was taken on board at Bayon Sara by my consent.'
 
 
 6
 IV. On the arrival of the steamer 'Sciota' at New Orleans, she and her cargo were seized by the United States military police, under the control of Col. Harai Robinson, then acting as provost-marshal-general of the Department of the Gulf, of which department Gen. S. A. Hurlbut was then in command.
 
 
 7
 V. After the seizure of the 'Sciota' and her cargo, General Hurlbut issued a special order, stating that, by direction of the major-general commanding the military division west of the Mississippi, the cotton brought by the steamer 'Sciota' should be disposed of as follows: A certain number of bales (number not shown) to be given to the claimants; the remainder to be turned over to O. N. Cutler, the United States purchasing-agent; and that the claimants, should give bonds for their appearance when required. On said Robinson's receipt of said order he sent for the claimants, and they appeared before him, and gave bonds; at which time they did not exhibit to him any papers in relation to the shipment of cotton. It was not the province of said Robinson to have anything to do with the receiving or disposing of the cotton.
 
 
 8
 VI. On or about the 21st of December, 1864, in the evening, after office hours, and claimants called on the said Robinson at his dwelling, and showed him the papers aforesaid, dated Oct. 26, 1864, signed by the Secretary of the Treasury and the President, which the said Robinson had not before seen or had any knowledge of, and the claimants asked him what he thought of that permit. He told them he thought it was a sweeping one; that it covered all ground. They answered that, notwithstanding that permit, the cotton aboard the 'Sciota' had been seized and detained, and themselves put under bond. He asked how that could be. They answered that the permit was of no account unless signed by the major-general commanding the department. He asked them if they had presented it to the general commanding. They said yes, and it had been refused. He then advised them to go to General Canby, who commanded the military division west of the Mississippi, and show the permit to him. They replied, 'You know that is useless by the very order which put us under bond: it states by order of the general commanding the military division west of the Mississippi.' They further said they were satisfied that it could not be done except by money; that money was wanted; and that they were willing to pay most liberally to have it signed; that that would cover and release their cotton. They said they would pay $10,000 to have that presidential permit indorsed, and their cotton released. He then told them to leave the permit with him, and he would see about it.
 
 
 9
 The next day the said Robinson took the permit to General Hurlbut, and told him the parties wished to have it signed by him. General Hurlbut replied, 'Yes, I have seen this permit before. I have refused to sign it.' Robinson then said, 'General, these men have offered a large amount of money to get this permit indorsed; there's money in it.' Hurlbut perused the permit carefully, and said, 'You must take that to Mr. Denison, and have him certify that the proper bonds have been filed by these parties, Clark and Fulton.' Robinson took the permit to said Denison, and advised him of the wishes of General Hurlbut. Denison then indorsed on the permit the following certificate:—— 'CUSTOM-HOUSE, COLLECTOR'S OFFICE,
 
 
 10
 'NEW ORLEANS, LA., NOV. 16, 1864.
 
 
 11
 'I certify that J. S. Clark and E. Fulton have delivered to me a bond, duly executed, with proper and sufficient sureties, in the sum of $250,000, as required by the foregoing authority from the Secretary of the Treasury.
 
 
 12
 [SEAL.]
 
 
 13
 'GEO. S. DENISON,
 
 
 14
 'Sp. Ag't of Treasury Dep't & Act'g Collector of Customs.'
 
 
 15
 Robinson then took the permit back to Hurlbut, who placed on it the following indorsement:——
 
 
 16
 'HEADQ'RS DEP'T GULF, Dec. 23, 1864.
 
 
 17
 'The above executive order will be obeyed and respected by all military officers within this department.
 
 
 18
 'S. A. HURLBUT, M. G. C.'
 
 
 19
 That day, or the next, the claimants handed Robinson, at his dwelling, $5,000; and subsequently, on the same day, he handed that money back to them, stating to them that it did not suit him to receive it in that manner. They asked him how he would receive it. He told them he would receive it through Denison, the collector of the port. The next morning Denison handed him an envelope with $5,000 in it, out of which Robinson took $2,000 or $3,000 and gave it to General Hurlbut, and laid away the balance in the provost-marshal-general's office.
 
 
 20
 After that money was given to Robinson, the claimant Clark saw him again, and said to him, 'Now I have the permit indorsed, see if you can get my cotton released; see if General Hurlbut will give an order releasing or justifying the release of my cotton.' Robinson then saw Hurlbut and stated the facts to him, and Hurlbut then wrote the following paper:——
 
 
 21
 'HEADQUARTERS DEPARTMENT OF THE GULF,
 
 
 22
 'NEW ORLEANS, Dec. 24, 1864.
 
 
 23
 'Pursuant to executive order of his exc'y the President of the United States, J. S. Clark and E. Fulton are permitted to bring the number of bales of cotton in said order mentioned from Ratcliff's Landing, on the Miss. River, 25 miles above Bayou Sara, on the steamer 'Sciota,' provided the same is received under protection of a gunboat. The taking of any passengers or freight to be landed at any point, or the payment of anything but United States treasury notes, will work forfeiture of steamer and cargo. The cotton returning on the boat will be reported and identified by Mr. O. N. Cutler and the prov. mar. gen'l.
 
 
 24
 'S. A. HURLBUT, M. G. C.'
 
 
 25
 The claimants then paid Robinson another $5,000, which was disposed of in the same manner as the first.
 
 
 26
 Afterward, and prior to the thirteenth day of February, 1865, they paid Robinson the further sum of $3,000, of which he gave $1,000 to General Hurlbut, and the rest was disposed of by Robinson in the provost-marshal-general's office.
 
 
 27
 Besides the moneys so received by Robinson from the claimants, other moneys were paid him by C. A. Weed & Co., the amount of which does not appear, and also the sum of $1,000 was paid him by the Courtney.
 
 
 28
 Of the whole amount paid him by all those parties, $8,000 went into the hands of General Hurlbut, who returned the same amount to Robinson on or about the 4th of April, 1865. With the remainder of said whole amount, or a part of it, Robinson purchased gold coin, which he deposited in the First National Bank of New Orleans, taking therefor certificates of deposit in favor of different officers of the bank, which they indorsed over to him, to the amount of $7,602.25.
 
 
 29
 VII. In January, 1865, a special commission in New Orleans was appointed by the Secretary of War, with the sanction of the President, and was in session there until May 5 following.
 
 
 30
 On the 13th of February, 1865, that commission placed the said Robinson in solitary confinement, and the same day stopped the payment of said certificates of deposit; and the amount of them, in gold coin, was afterward turned over by the commission to the Secretary of War, by whom the same was put as a special deposit in the Treasury Department until the 16th of June, 1869, when, at the request of the Secretary of War, the same was covered into the treasury.
 
 
 31
 That commission also took $8,000 from said Robinson, which was likewise turned over to the Secretary of War, by whom it was, with the addition of $40 interest, accrued on compound interest notes, paid into the treasury on the 10th of June, 1869.
 
 
 32
 VIII. The money paid as aforesaid by the claimants to said Robinson was paid by them with the corrupt motive and purpose on their part of procuring official action whereby their cotton should be released.
 
 
 33
 The following additional finding was allowed at the request of the claimants.
 
 
 34
 It does not appear that there were any interviews between the claimants and the said Robinson upon any subject, nor any offer of the payment of any sum or sums of money by them to the said Robinson, for any purpose, until after the seizure, by the United States military police, of the claimant's steamer 'Sciota' and the cargo of cotton thereon, which had been shipped from Bayou Sara, La., under the pass and supervision of Lieut.-Com. John J. Cornwell, of the United States steamship 'Choctaw,' on the thirteenth day of December, 1864.
 
 
 35
 Upon the foregoing facts the conclusion of law was that the claimants were not entitled to recover.
 
 
 36
 The petition having been dismissed, the claimants appealed here.
 
 
 37
 The paper referred to in the first finding is as follows:——
 
 
 38
 'TREASURY DEPARTMENT, Oct. 26, 1864.
 
 
 39
 'J. S. Clark and E. Fulton allege that prior to the second day of July, 1864, under authority of Geo. S. Denison, special agent of the Treasury Department at New Orleans, they purchased in the parishes of East and West Feliciana, in the State of Louisiana, 3,435 bales of cotton upon which they advanced the sum of $123,200 in United States currency, as part payment for the same, and became liable to pay the balance of the purchase-money.
 
 
 40
 'That after purchasing and becoming owners of said cotton, and while in the act of moving the same to market for sale, they ascertained that by the passage of the act of July 2, 1864, they were prevented from proceeding with the shipment of said cotton or in any way interfering with the same, and it now remains at the points above named, exposed to the depredations of guerillas. They therefore ask that authority may be granted them to complete the transaction commenced and conducted thus far under the prescribed rules and regulations of the Treasury Department.
 
 
 41
 'After full examination, and in view of the fact that the loyalty of the parties is not questioned, and that there are no adverse claimants to said cotton known to the department, authority is hereby given to the said J. S. Clark and E. Fulton to transport by way of New Orleans (where all government fees and dues shall be paid before shipment therefrom) the cotton in question, provided they shall first present to the acting collector of customs, at New Orleans, the original authorities or permits under which they acted, or copies thereof certified by the officer with whom they are filed, with proof to his satisfaction that the cotton was actually purchased in good faith, under and by virtue of said authorities, and payment made and liabilities incurred as alleged; and provided further, that the said J. S. Clark and E. Fulton shall first execute to the satisfaction of the said acting collector at New Orleans a bond with sufficient security in the penalty of $250,000, conditioned that all fees and taxes, in any way due or accruing to the government of the United States from said cotton, shall be paid on its arrival at New Orleans, and any cotton transported or attempted to be transported under this authority without the original permits or authorities, or certified copies thereof and proof herein required, shall be seized and proceeded against for forfeiture and condemnation to the United States.
 
 
 42
 'The acting collector at New Orleans shall record and file, in his office, a copy of this authority, and deliver the original to the said J. S. Clark and E. Fulton, after indorsing upon it his certificate, attested by his official seal, that the required bond has been duly executed and delivered.
 
 
 43
 'The conditions herein stipulated having been complied with, the cotton moving under this authority, or under permits given in pursuance hereof, will be allowed to be transported without hindrance or delay.
 
 
 44
 'The leave hereby granted is confined to so much of said cotton as had been actually paid for, or said parties had become legally liable to pay for, under and by virtue of permits properly issued by authority of this department, prior to said second day of July, 1864, and the power to revoke the authority hereby granted at any time, should satisfactory cause appear, is reserved to this department.
 
 
 45
 'W. P. FESSENDEN,
 
 
 46
 'Secretary of the Treasury.'
 
 
 47
 'EXECUTIVE MANSION, Oct. 26, 1864.
 
 
 48
 'The Secretary of the Treasury having by the terms of and upon the conditions contained in the foregoing paper by him signed, directed that J. S. Clark and E. Fulton be allowed to transport from certain localities in the State of Louisiana, to markets in the loyal States or elsewhere, 3,435 bales of cotton owned by them in said State, and that permits be given them for that purpose by the acting collector of customs at New Orleans:
 
 
 49
 'It is ordered that all cotton moving in compliance with such direction of the Secretary of the Treasury, or permits granted in pursuance thereof, shall be free from seizure or detention by any officer of the government, and commandants of military departments, districts, posts, and detachments, naval stations, gunboats, flotillas, and fleets will observe this order, and give the said J. S. Clark and E. Fulton, their agents and transports, proper facilities and passes for the purpose of getting said cotton through the lines, and safe conduct within our lines while the same is moving in strict compliance with the directions of the Secretary of the Treasury and permits above referred to.
 
 
 50
 'ABRAHAM LINCOLN.'
 
 
 51
 Mr. Samuel Shallabarger and Mr. John J. Weed for the appellants.
 
 
 52
 The appellants might have recovered of the provost-marshal-general at New Orleans the money which he received from them to secure the release of their cotton and the indorsement of the permit and executive order. His wrongful and fraudulent extortion of the money which was ultimately taken from him and deposited in the treasury did not divest them of their title to it, nor bar their right to recover it of the United States.
 
 
 53
 An action may be maintained whenever the defendant, who has received money belonging to the plaintiff, is obliged by the ties of natural justice and equity to refund it. Carey v. Curtis, 3 How. 236; Nash v. Towne, 5 Wall. 689; Moses v. Macferlan, 2 Burr. 1005; Clark v. Shee, Cowp. 197; Butler v. Harrison, id. 565; Chilton v. Braiden's Administratrix, 2 Black, 458; Castle et al. v. Bullard, 23 How. 172; Olmstead v. Hotaling, 1 Hill (N. Y.), 318; Bank of Boston v. United States, 10 Ct. of Cl. 519.
 
 
 54
 The appellants paid the money to the provost-marshalgeneral to procure the release of their property which he had illegally seized, and to obtain the possession of it which he unlawfully detained from them. It is well settled that a party paying money for such a purpose may recover it in an action for money had and received. Atlee v. Backhouse, 6 Mee. & W. 633, 650; Chase v. Dwinall, 7 Me. 134; Oates v. Hudson, 6 Exch. 346; Shaw v. Woodcock, 7 Barn. & Cress. 73; Joyner v. Egremont, 3 Cush. (Mass.) 567; Preston v. Boston, 12 Pick. (Mass.) 7; Boston & Sandwich Glass Co. v. Boston, 4 Mich. 181; Riply v. Gelston, 9 Johns. (N. Y.) 201; Clinton v. Strong, 9 id. 370; Baltimore v. Heffernan, 4 Gill (Md.), 425; Forbes v. Appleton, 5 Cush. (Mass.) 118; Storer v. Mitchell, 45 Ill. 213; 1 Parsons, Contracts, 395, 5th ed.
 
 
 55
 The right of the appellants to recover in this action cannot be defeated, upon the maxim, In pari delicto potior est conditio defendentis.
 
 
 56
 The evidence does not establish such a state of facts as renders this principle applicable. The appellants' cotton had been seized previously to the payment of the money, and the executive order of the President of the United States, exempting it from seizure by the military authorities, was ignored and treated with contempt. The acts of the provost-marshal-general were illegal and oppressive, and the appellants were obliged to apy the money extorted by that officer or submit to those acts. It was not a case of par delictum. It was oppression on one side and submission on the other. It can never be predicated as par delictum, when one holds the rod and the other bows to it. Smith v. Cuff, 6 Man. & Sel. 160; Alsoqer v. Spalding, 4 Bing. N. C. 407; Horton v. Riley, 11 Mee. & W. 492; Browning v. Morris, Cowp. 790.
 
 
 57
 The Solicitor-General, contra.
 
 
 58
 MR. CHIEF JUSTICE WAITE delivered the opinion of the court.
 
 
 59
 Upon the facts found the court below was right in treating this as a case of bribery rather than extortion. The claimants undoubtedly held an executive license to transport by way of New Orleans, notwithstanding the act of July 2, 1864 (13 Stat. 377, sect. 9), any cotton they had bought in the parishes of East Feliciana and West Feliciana, under the authority of the special agent of the treasury at New Orleans, if they gave the required bond and presented to the acting collector of customs at that port the original authorities or permits under which they acted, or copies thereof certified by the officer with whom they were filed, with proof to the satisfaction of the acting collector that the cotton was actually purchased in good faith under and by virtue of such authorities. By the express terms of this license any cotton transported, or attempted to be transported, under it, without the original permits or authorities or certified copies and proof required, was subject to seizure and condemnation. It is not pretended that when the seizure was made the claimants had in their possession any evidence of their right, under this authorization, to transport the cotton which was seized. While it has been found that the bond was executed and delivered to the acting collector on the 16th of November, 1864, the findings are entirely silent as to the presentation of the original permits or the required proof before the transportation was entered upon. Neither did the executive license have upon it the prescribed certificate that the bond had been executed and delivered. Under such circumstances the seizure could not have been wrongful in the first instance. It was the duty of the military authorities at that point to see that nothing passed out from the enemy's country under this authority until the requisite evidence was furnished. New Orleans was a military post, and Congress had seen fit to restrict materially the power of the President to permit commercial intercourse with the inhabitants of the insurgent territory. The executive license, when construed in connection with this new congressional action, was evidently intended only to protect such rights as had become vested under previous authorities or permits rightfully issued. Therefore, nothing could pass except what the collector had been satisfied by proof was 'actually purchased in good faith under and by virtue of said authorities.'
 
 
 60
 The claimants, when the seizure was made, did not attempt to secure a release by producing the necessary evidence of their rights, but by tempting a subordinate officer in the military service by a liberal offer of money. He made no demands, but accepted what they voluntarily gave him. In this way the executive order was evaded and a pass through the lines secured by corrupting an officer. Clearly this was bribery, and placed the claimants and the man they corrupted in pari delicto. They could not recover back from him the money they paid, neither can they from the United States after it has been taken from him as a punishment for his faithlessness to his trust.
 
 
 61
 It is insisted, however, that when the claimants presented to the military authorities the executive license, with the certificate of the acting collector indorsed to the effect that the requisite bond had been delivered to him, they had done all that was required to get their property back and proceed with the transportation. They evidently did not so understand the effect of what they had done, for they voluntarily offered and paid more money to secure what they wanted, and that they interpreted the instrument correctly is, to our minds, clear. The execution of the bond is one thing, and the production of the original permits and proof another. It is true that in the license the provision as to the bond follows that as to the permits and proof; but the delivery and acceptance of the bond were no more evidence of the presentation of the permits than the presentation of the permits would have been of the delivery of the bond. The certificate of the bond on the license was eidence of the performance of that condition, but nothing more. The execution of the bond was not at all dependent on the presentation of the permits and proof. The penalty of the bond was fixed in Washington and specified in the license itself, and it was entirely immaterial, so far as the requirements of the license were concerned, whether the bond was delivered before or after anything else was done. Before, therefore, the commanding general could be required to release the seizure, it must have been shown to him that the acting collector was satisfied that the original permits had been given, and the purchases in good faith made, as alleged by the claimants. Instead of attempting to make such a showing, bribery was resorted to, and in that way the necessary order obtained.
 
 
 62
 Beyond all doubt, the judgment below was right, and it is consequently
 
 
 63
 Affirmed.