Simon C. FIREMAN, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 99–17 C.

United States Court of Federal Claims.

Sept. 2, 1999.

**530**

Morris M. Goldings, Boston, Massachusetts, for plaintiff.

Shalom Brilliant, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom were David M. Cohen, Director, and David W. Ogden, Acting Assistant Attorney General.

## OPINION AND ORDER

DAMICH, Judge.

## I. INTRODUCTION

What happens to the money that is illegally donated to a political campaign? This lawsuit attempts to answer this question within the following factual predicate.

The Plaintiffs (Simon C. Fireman and Aqua–Leisure Industries, Inc., a corporation controlled by Fireman) contributed money to the Dole for President Committee. These donations were illegal because they exceeded the $1,000 maximum donation per individual, and campaign donations by corporations are prohibited. Fireman was prosecuted, pled guilty, was sentenced to home confinement, and fined $1 million. Aqua–Leisure also pled guilty and was fined $5 million.

Following Federal Election Commission Advisory Opinion 1996–5 [hereinafter "AO 1996–5"], the Dole Committee gave the illegal contributions to the United States Treasurer.[1] The Plaintiffs asked that the Dole Committee return the illegal contributions, which totaled $69,000. Having disgorged itself of the donations, the Dole Committee could not return the contributions. The Plaintiffs attempted through informal means to recover the contributions from the United

States Government. When those attempts failed, this lawsuit was instituted. The lawsuit seeks the recovery of the contributions originally given to the Dole Committee.

The Defendant filed a motion to dismiss with two grounds. Pursuant to RCFC 12(b)(1), the Defendant argues that this court should dismiss the lawsuit because this court lacks subject matter jurisdiction. Alternatively, pursuant to RCFC 12(b)(4), the Defendant argues that this court should dismiss the lawsuit for failure to state a claim upon which relief can be granted.

For the reasons stated, the Motion to Dismiss is GRANTED in part and DENIED in part.

## II. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A. Jurisdiction of the Court of Federal Claims

"[I]n passing on a motion to dismiss, whether on the grounds of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); accord *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 746 (Fed.Cir.1988).

The Tucker Act establishes the jurisdiction of this court. "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491. By judicial

---

1. AO 1996–5 permitted a campaign to return illegal donations to the United States Treasurer. AO 1996–5 overruled an earlier interpretation of the same regulation, 11 C.F.R. § 103.3(b)(2). In Advisory Opinions 1989–5 and 1984–52, the Fed-

eral Election Commission (FEC) required the illegal donation to be returned to the donor when the donor was identified. These Advisory Opinions are described in more detail later in the opinion.

interpretation, however, the Constitutional provision, the Act of Congress or the regulation must mandate the payment of money. *United States v. Testan*, 424 U.S. 392, 401–02, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1976). The Court of Claims has ruled that a provision of law is "money-mandating" if "the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967). The Court of Claims also has ruled that it had jurisdiction over lawsuits "to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute." *Id.*, 372 F.2d at 1008, 178 Ct.Cl. at 606.

The Plaintiffs claim jurisdiction under the "money-mandating" aspect of this court's jurisdiction and the "illegal exaction" aspect. The motion to dismiss attacks both claims.

## B. Money Mandating Provisions
### 1. Fifth Amendment

The Court will first dispense with the issue of whether a constitutional provision confers jurisdiction on this court. Count Two alleges that the Defendant's actions "constituted a denial of procedural due process and a deprivation of Plaintiffs' property without due process of law." Count Three alleges that the Defendant's actions "constituted a denial of substantive due process and a deprivation of Plaintiffs' property without due process of law."

■ The procedural and substantive Due Process clauses of the Fifth Amendment[2] are not money mandating. See, *James v. Caldera*, 159 F.3d 573, 580 (Fed.Cir.1998). Accordingly, Count Two and Count Three are dismissed from the lawsuit.

The Court now turns to whether either a statute or a regulation (as opposed to a constitutional provision) is "money mandating."

Here, the Plaintiffs allege that 2 U.S.C. § 437d(e) and 11 C.F.R. § 103.3(b)(2) are "money mandating."

### 2. 2 U.S.C. § 437d(e)

The Plaintiffs found their action on 2 U.S.C. § 437d(e). This statute provides:

> Except as provided in section 437g(a)(8) of this title, the power of the Commission to initiate civil actions under subsection (a)(6) of this section shall be the exclusive civil remedy for the enforcement of the provisions of this Act.

2 U.S.C. § 437d(e).

The Defendant argues that this statute is irrelevant to the present case because this statute restricts only the Federal Election Commission's authority to conduct enforcement actions. In this case, the government did not obtain the money as a result of an enforcement action. The government received the money after the Dole Committee sent the money to it.

The Plaintiffs seem to contend that the FEC exceeded its authority. The government prosecuted the Plaintiffs and they were punished. This punishment included paying fines. The Plaintiffs do not object to those events. The Plaintiffs, however, challenge the FEC's right to direct the Dole Committee to disgorge the illegal contributions to the United States Treasurer. The Plaintiffs believe that having paid a fine, the FEC imposed another penalty on them by requiring the Dole Committee to give the Plaintiffs' money to the United States Treasurer. This additional penalty, therefore, violates 2 U.S.C. § 437d(e).

The Court disagrees with the Plaintiffs' argument. On its face, Section 437d(e) limits the authority of the FEC. Even if the Court were to accept that the FEC somehow "caused" the Dole Committee to disgorge the money to the United States Treasurer,[3] the statute does not mandate the payment of money. The statute does not refer to the

---

2. The Court notes that the Plaintiffs largely ignored this issue in their brief. The Plaintiffs mention "ex post facto" without citing any cases that hold that a violation of the Fifth Amendment's "ex post facto" clause grants this court jurisdiction. Because this issue was not raised in the complaint and not effectively briefed, the

Court will not address the merit of this argument.

3. The Court will address this argument in the next section.

obligation of the United States to pay money either by its express terms or by implication.

■ Without an express waiver of sovereign immunity, this Court lacks subject matter jurisdiction to hear the case. Sovereign immunity is "strictly construed, in terms of its scope, in favor of the sovereign." *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 691, 142 L.Ed.2d 718 (1999). "In construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." *Fidelity Construction Co. v. United States*, 700 F.2d 1379, 1387 (Fed.Cir.1983).

■ These principles regarding sovereign immunity preclude a finding that 2 U.S.C. § 437d(e) mandates a payment of money by the United States, since the statute does not refer in any way to the United States Government's obligation to pay money. Thus, to the extent that the complaint relies on 2 U.S.C. § 437d(e), the motion to dismiss is granted.

### 3. 11 C.F.R. § 103.3(b)(2)

■ Besides 2 U.S.C. § 437d(e), the Plaintiffs rely on 11 C.F.R. § 103.3(b)(2).[4] The FEC has issued several Advisory Opinions interpreting this regulation. The two most relevant to this case are AO 1989–5 and AO 1996–5.

In AO 1989–5, the FEC determined who was the "contributor" that made an illegal campaign donation. In that opinion, the FEC addressed a situation in which a campaign accepted a donation from an individual (Hill). Later, after Hill pled guilty to violating election laws, the campaign learned that actually the individual was illegally[5] making donations for a corporation (Sperry Corp., which was later Unisys). The campaign attempted to return the donation to the individual, but was rejected. The campaign, then, asked the FEC whether it should return the money to the corporation.

The FEC ruled that the corporation was the "contributor" to whom the money should have been returned. "The resolution of [the] inquiry turns on the interpretation of the phrase 'to the contributor.'" Advisory Opinion, 1989–5, page 1. "In light of 11 C.F.R. § 103.3(b)(2) and Advisory Opinion 1984–52, the Commission concludes that [the] committee must refund the illegal contribution to the corporation that was its source Sperry/Unisys." *Id.*, 2.

The FEC revisited 11 C.F.R. § 103.3(b)(2) in AO 1996–5. The facts of AO 1996–5 resemble the facts in AO 1989–5. In AO 1996–5, a political campaign accepted donations from five individuals who worked for Samsung America, Inc. The corporation pled guilty to reimbursing the individuals for the contribution. The campaign, therefore, asked to whom should the donations be returned.

Citing AO 1989–5 and AO 1984–52, the FEC ruled that the campaign *could* return the donation to Samsung. "[W]here the facts establish the identity of the unlawful source of the contributions, the Commission has applied section 103.3(b)(2) and concluded that an amount equal to the amount of the prohibited contributions should be promptly refunded to the contributors." Advisory Opinion 1996–5, page 3.

---

4. (b) The treasurer shall be responsible for examining all contributions received for evidence of illegality and for ascertaining whether contributions received, when aggregated with other contributions from the same contributor, exceed the contribution limitations of 11 C.F.R. §§ 110.1 or 110.2.

 * * *

 (2) If the treasurer in exercising his or her responsibilities under 11 C.F.R. § 103.3(b) determined that at the time a contribution was received and deposited, it did not appear to be made by a corporation, labor organization, foreign national or Federal contractor, or made in the name of another, but later discovers that it is illegal based on new evidence not available to the political committee at the time of receipt and deposit, the treasurer shall refund the contribution to the contributor within thirty days of the date on which the illegality is discovered. If the political committee does not have sufficient funds to refund the contribution at the time the illegality is discovered, the political committee shall make the refund from the next funds it receives.

5. A corporation is prohibited from donating to a federal election campaign. 2 U.S.C. § 441b(a).

The FEC also stated: "[t]hat course of action is one option that may be taken in your case.... In the alternative, the Committee may pay [the sum] to the United States Treasury." *Id.* In a footnote, the Commission explained:

> The Commission has interpreted the statute to allow amounts equal to mandatory contribution refund amounts to be disgorged to the United States Treasury, in lieu of making payments to the entity that unlawfully made the original contribution. *See* MUR 3460.

> To the extent that Advisory Opinions 1989–5 and 1984–52 hold that payments equal to the amounts of previously accepted unlawful contributions may only be made to the entity that is determined to have been the source of the unlawful contributions, those opinions are hereby superseded. Refund equivalent payments to the United States Treasury comport with the underlying reason for the refund rule of 11 C.F.R. § 103.3(b)(2).

*Id.*, n. 4.

The Chair of the FEC dissented. Because of the Plaintiffs' extensive reliance on the dissent, the Court quotes from it at length:

> The Commission's regulation at 11 C.F.R. § 103.3(b)(2) clearly require illegal contributions to be refunded to the contributor. I objected for the record to the Office of the General Counsel's Report circulated in MUR 3460, which recommended disgorgement of illegal contributions to the U.S. Treasury as an option to refunding the contributor. Prescribing the remedy of disgorgement of illegal contributions to the U.S. Treasury is beyond our authority in the context of an enforcement action, and I believe that to be the case in an Advisory Opinion as well. I would follow the precedent established in Advisory Opinions 1989–5 and 1984–52. The contribution in this matter should be refunded to the actual prohibited contributor, Samsung America, Inc.

6. In pertinent part, the letter states: "Federal law *requires* repayment to the United States government of an amount equal to the amount of contributions received by the campaign that

I understand the argument for disgorgement to be one of equity such that a violator of the law should not be enriched due to a refund of contributions prohibited in the first place. Nevertheless, the manner for establishing such a policy in direct contradiction to our previously published regulations is through regulatory reforms, not on a specific situation as it arises in an advisory opinion request.

*Id.*, (Dissenting opinion).

Within this regulatory framework, the Plaintiffs made their illegal contributions to the Dole Committee. By letter dated July 31, 1996, the Dole Committee disgorged the illegal contributions to the United States Treasury.[6] After several communications between counsel for the Plaintiffs and the Federal Election Commission, the Plaintiffs learned that the Federal Election Commission would not return the money to the Plaintiffs based on AO 1996–5.

The Defendant challenges the Plaintiffs' reliance on 11 C.F.R. § 103.3(b)(2) in the motion to dismiss. The Defendant argues that this regulation cannot be "money mandating" because it does not direct the United States to do anything. Instead, the regulation places certain affirmative duties on treasurers of political campaigns. Further, the regulation does not require the United States to pay money to the contributor if the political campaign chooses to disgorge the illegal contribution by giving it to the United States Treasurer.

The Plaintiffs do not address this argument.

For the reasons explained in connection with 2 U.S.C. § 437d(e), the Court finds that 11 C.F.R. § 103.3(b)(2) is not money mandating. The regulation does not place any duties on the United States.

### C. Illegal Exaction

In addition to a theory that this court has jurisdiction based on a money mandating provision, the complaint presents the alterna-

were subsequently determined in a plea agreement to have been illegally made. *See* Advisory Opinion 1996–5." Exhibit 2 to the Complaint (italics added).

tive theory that the government committed an "illegal exaction." The Defendant also argues that under this theory, the court has no jurisdiction.

### 1. Basic Law of Illegal Exaction

 In *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed.Cir. 1996), the Federal Court reviewed the theory of "illegal exaction."

> Tucker Act claims may be made for recovery of monies that the government has required to be paid contrary to law. The Court of Claims explained that an illegal exaction claim may be maintained when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). The Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power. 178 Ct.Cl. at 605, 372 F.2d at 1007–08. *See South Puerto Rico Sugar Co. Trading Corp. v. United States*, 167 Ct.Cl. 236, 244, 334 F.2d 622, 626 (1964), cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965) (recovery of "exactions said to have been illegally imposed by federal officials (except where Congress has expressly placed jurisdiction elsewhere)"); *United States v. Emery, Bird, Thayer Realty Co.*, 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825 (1915) (tax refund suit). In *Eversharp, Inc. v. United States*, 129 Ct.Cl. 772, 776, 125 F.Supp. 244, 247 (1954) the Court of Claims held that on the allegation that the government had illegally exacted money by enforcement of a regulation that was contrary to statute, the court had jurisdiction under the Tucker Act to render judgment against the United States for recovery of that money. Similarly in *Mallow v. United States*, 161 Ct.Cl. 446, 450 1963 WL 8503 (1963), the court held that the Tucker Act provided jurisdiction in the Court of Claims for recovery of money that the government illegally collected from the plaintiff as fines under void convictions and sentences. *See also Suwannee S.S. Co. v. United States*, 150 Ct.Cl. 331, 335–36, 279 F.2d 874, 876 (1960) (ship owner may recover payment illegally exacted as a condition of receiving permission to sell ship to a foreign purchaser); *Seatrade Corp. v. United States*, 152 Ct.Cl. 356, 360, 285 F.2d 448, 450 (1961) (same).

> As the Court of Claims put it in *Clapp v. United States*, 127 Ct.Cl. 505, 512, 117 F.Supp. 576, 580, cert. denied, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954), an illegal exaction has occurred when "the Government has the citizen's money in its pocket." Suit can then be maintained under the Tucker Act to recover the money exacted. 127 Ct.Cl. at 513, 117 F.Supp. at 580; *Pan American World Airways v. United States*, 129 Ct.Cl. 53, 55, 122 F.Supp. 682, 683–84 (1954) ("the collection of money by Government officials, pursuant to an invalid regulation" is an illegal exaction and not a tort); *Carriso v. United States*, 106 F.2d 707, 712 (9th Cir.1939) (when a government agent construes a statute as remaining in effect after it has been repealed and uses it as a basis to collect fees, a claim to recover the fees is "founded upon a law of Congress" and "does not sound in tort").

*Id.*

### 2. Parties' Arguments

The Defendant argues that there was no illegal exaction because there was no "compulsion." The Defendant highlights the fact that the Dole Committee, even under AO 1996–5, had a choice to disgorge the money to either the contributors or the United States. The government did not influence this choice, at all. The government did not even request that the Dole Committee turn the money over to the United States Treasury. Thus, the government was not responsible for its ultimate possession of the money.

The Defendant also argues that there was no illegal exaction because the Plaintiffs voluntarily relinquished control of the money when they gave it to the Dole Committee. According to the Defendant, after the Plain-

tiffs gave away the money, they lost any interest in its return to them.

The Plaintiffs present two arguments in response. First, the Plaintiffs question whether the Defendant's argument actually implicates this court's subject matter jurisdiction. Second, the Plaintiffs maintain that a careful reading of the relevant precedent does not require the government to coerce the exaction of money for there to be an illegal exaction.

### 3. Analysis

#### a. Jurisdiction

The Court begins by examining whether the Defendant has challenged the subject matter jurisdiction. In doing so, this Court is following the example set by the Court of Claims:

> We consider first the question of jurisdiction. For this purpose we assume that the Immigration and Naturalization officials misinterpreted the relevant statute; that the regulations which they purported to make pursuant to the statute were not authorized by the statute and were void; and that there was, therefore, no right in the Government to collect the money here in question from the plaintiff.

*Pan American World Airways v. United States*, 122 F.Supp. 682, 683, 129 Ct.Cl. 53, 55 (1954).

In *Pan American*, the Court of Claims determined that it had jurisdiction. *Id.*, 122 F.Supp. at 684, 129 Ct.Cl. 53. Ultimately, the court also determined that the Plaintiff failed to show that the United States acted illegally. The court, therefore, granted summary judgment, which is a determination on the merits of the action, for the Defendant. *Id.*, 122 F.Supp. at 686, 129 Ct.Cl. at 60.

The Federal Circuit followed a similar procedure in *Aerolineas Argentinas v. United States*, supra, 77 F.3d at 1573–74. The Federal Circuit stated that the Plaintiffs had established jurisdiction in the Court of Federal Claims when they pled "a claim for the recovery of monies that they assert were illegally exacted." The court, then, examined whether the regulation on which the government relied was "misinterpreted, misapplied, or invalid." In doing so, the Federal Circuit

again noted "[i]f the [Plaintiffs] fail to establish that the exaction was contrary to law, that failure does not deprive the court of jurisdiction, but serves as an adjudication on the merits." *Id.*, at 1574.

These cases stand for the principle that the Court should hesitate before ruling that it lacks subject matter jurisdiction over a claim of illegal exaction. Nevertheless, this interpretation of *Pan American* and *Aerolineas Argentinas* does not resolve the issue completely for this case presents the questions of whether the Plaintiffs must allege government coercion as a part of a claim for illegal exaction and, if so, whether the failure to allege this element deprives this Court of subject matter jurisdiction.

#### b. Compulsion

Whether government coercion is an essential element of a claim for illegal exaction has not been directly addressed before. To support their argument that compulsion is not required, the Plaintiffs seize language from *Aerolineas Argentinas*: "As the Court of Claims put it in *Clapp v. United States*, 127 Ct.Cl. 505, 512, 117 F.Supp. 576, 580, *cert. denied*, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954), an illegal exaction has occurred when 'the Government has the citizen's money in its pocket.'" *Aerolineas Argentinas v. United States, supra*, 77 F.3d at 1574.

Further, additional language from *Clapp* helps the Plaintiffs. "In the discussion of the question of jurisdiction, we assume that there was no legal authority in the Maritime Administration to demand or *receive* the [money]." *Clapp v. United States, supra*, 117 F.Supp. at 578, 127 Ct.Cl. at 509 (emphasis added).

The Defendant maintains that in every case where a Plaintiff stated a cause of action for "illegal exaction," the government coerced the payment. For example, in *Aerolineas Argentinas*, the Immigration and Naturalization Services "*required* the airlines to pay to house, sustain and guard aliens who, having arrived in the United States on plaintiff's airlines without entry documents, sought political asylum." *Aerolineas Argentinas v. United States, supra*, 77 F.3d at 1568 (emphasis added). The United States reads

*Aerolineas Argentinas* as determining whether the exaction was "illegal," not determining whether there was an "exaction" at all. The Defendant concludes that because all prior cases included "compulsion," "compulsion" is required.

The Court disagrees with the reasoning of the Defendant. This Court rules, under the facts of this case, that government "coercion" is not required. Four reasons support this holding.

First, *Aerolineas Argentinas* establishes that "illegal exaction" is not strictly construed. For example, the "illegal exaction" was *not* paid to the government. The Federal Circuit ruled that this fact did not preclude a cause of action for an illegal exaction.

> The Court of Federal Claims held that because no money was required by the government to be paid directly to it by [the Plaintiffs], the airlines can not state a claim on the theory of illegal exaction, even if the payment requirement were contrary to law. However, such claim may lie if the government required payment to it "directly or in effect," *Eastport,* 178 Ct.Cl. at 605, 372 F.2d at 1007. The amount exacted and paid may be recovered whether the money was paid directly to the government, or was paid to others at the *direction* of the government to meet a governmental obligation.

*Id.*, at 1573 (emphasis added).

Second, the Federal Circuit continues to recognize that "an illegal exaction has occurred when the Government has the citizen's money in its pocket." *Id.* (internal quotation marks omitted). Although this Court is always bound to follow the Federal Circuit, this quotation from *Aerolineas Argentinas* is especially significant. In that case, the government did not have the Plaintiffs' money. The Plaintiffs actually had paid hotels and other people to care for the illegal entrants. Thus, the fact that the Federal Circuit reached out to quote from a 1954 Court of Claims case to define an illegal

exaction shows the Federal Circuit believes this definition holds continued vitality.

With this definition in mind, the Plaintiffs have stated a cause of action for illegal exaction or, phrased differently, a cause of action to recover their money in the government's pocket. Whether the money truly is theirs, not the government's, is a separate question.

Third, the Court views the FEC change from AO 1989–5 to AO 1996–5 as having a coercive quality to it. Under AO 1989–5, donors had a right to be repaid any money that they illegally donated to a campaign. This right was absolute. 11 C.F.R. § 103.3(b)(2). The donors can be viewed as retaining an interest in money, even after the donors "give away" the money. The "gift" can be expressed in this way: "We give the political campaign X dollars on the condition that the donation is legal; if this condition fails, then the gift is void and the money shall be returned to us." Although this interpretation may appear awkward, it is precisely what the law not only permitted, but actually guaranteed. Campaign donors knew that if the campaign did not receive the money, the money would be returned to them. Campaign donors could rely that 11 C.F.R. § 103.3(b)(2) meant exactly what it says on its face: "the treasurer shall refund the contribution to the contributor." [7]

In changing its interpretation of 11 C.F.R. § 103.3(b)(2), the FEC has taken away the *absolute* quality of the donors' right for repayment if their contribution is rejected. Under the new interpretation, the FEC empowered the campaign to select an entity other than the donors, namely the United States Treasury, to receive the disgorged funds. The donors' guaranteed interest in the return of the money has been eliminated. The donors may not want their disgorged campaign contributions to be sent to the United States Treasury, but the donors have no control over whether the money is given to the Treasury or them. The compulsion is over the Plaintiffs' right (or lack thereof) to

---

**7.** The complaint does not indicate whether the FEC upset the Plaintiffs' settled expectations. AO 1996–5 was issued on March 14, 1996. The information charging the Plaintiffs with certain crimes was filed on July 10, 1996. It is not apparent from the complaint whether the illegal donations were made before March 14, 1996, the date that the FEC changed its interpretation.

control where the money winds up after disgorgement.

Fourth, as a matter of policy, the Court believes that the Plaintiffs are entitled to their day in court. "Illegal exactions" present challenging fact patterns, perhaps because the charge that government officials acted without authorization arises infrequently. Given the fact pattern presented in this case, if donors whose illegal contributions are not returned to them cannot challenge AO 1995–6, then who will challenge whether the FEC's new interpretation is correct? See, *United States Defense Committee v. Federal Election Comm'n*, 861 F.2d 765, 772 (2nd Cir.1988) (stating "an advisory opinion itself is not so final or binding that it is reviewable" and determining that a challenger to an FEC advisory opinion lacked standing); see also, *National Conservative Political Action Committee v. Federal Election Comm'n*, 626 F.2d 953, 957 (D.C.Cir.1980) (permitting the Plaintiff to challenge the *procedural* propriety of an FEC advisory opinion).

In *Pan American*, one of the earliest cases that discussed a cause of action for illegal exaction, the Court of Claims discussed its jurisdiction:

> However, the considerable body of authority, both in the Supreme Court and in other Federal courts, and the compelling equities of these situations in which the Government admittedly has the citizen's money and seeks to keep it, seemed to us to justify our requiring the Government to disgorge what it has no right to retain.

*Pan American, supra,* 122 F.Supp. at 683. Likewise, in this case, because the Plaintiffs have presented a prima facie case that the FEC acted without authority in its decision in AO 1996–5, the "compelling equities" favor a finding that this Court has subject matter jurisdiction.

### D. Conclusion—Subject Matter Jurisdiction

Based on the illegal exaction by the government, the Court has subject matter jurisdiction over Count One of the complaint. The Court turns, now, to whether the Plaintiffs have stated a claim.

### III. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

#### A. Standard for Determining

"A motion to dismiss under Rule 12(b)(4) for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy.... In reviewing the dismissal under Rule 12(b)(4), we are mindful that we must assume all well-pled factual allegations as true and make all reasonable inferences in favor of ... the non-movant." *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998). "Dismissal under Rule 12(b)(4) is appropriate only when it is beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitled him to relief.... Because granting such a motion summarily terminates the case on its merits, courts broadly construe the complaint, particularly in light of the liberal pleading requirements under the Federal Rules of Civil Procedure." (Citations omitted; internal quotation marks omitted.) *Ponder v. United States,* 117 F.3d 549, 552–53 (Fed.Cir.1997), cert. denied, 522 U.S. 1110, 118 S.Ct. 1040, 140 L.Ed.2d 106 (1998).

#### B. Arguments for Dismissing the Complaint

The motion to dismiss presents three basic arguments. First, the Plaintiffs have failed to allege that they owned the money. Second, the agency's interpretation of 11 C.F.R. § 103.3(b)(2) is entitled to substantial deference. Thus, the exaction—assuming there was an exaction—was not "illegal." Third, the Court cannot permit the Plaintiffs to recover this money because the Plaintiffs violated the law. The Court discusses each argument below.

##### 1. Ownership of the Money

In the original complaint, the only Plaintiff was Simon C. Fireman; Aqua–Leisure Industries, Inc., was not a Plaintiff. The original complaint did not say directly that Fireman owned the money. The Defendant mentioned this issue in a pleading be-

fore the amended complaint was filed and before the motion to dismiss was filed. The amended complaint did not change, other than to add a second plaintiff, Aqua–Leisure Industries, Inc.

Because the amended complaint does not state that the Plaintiffs owned the money, the Defendant contends that the case should be dismissed. Despite the Plaintiffs' intransigence in not amending the complaint,[8] the Court rejects the Defendant's argument.

The complaint sufficiently implies that both Plaintiffs owned the money. The complaint states that both Plaintiffs pled guilty to certain charges in a criminal indictment. AO 1989–5 holds that "the criminal information and the guilty plea of the corporation to the charges therein constitute an adequate factual basis for concluding that the corporation should receive the funds." Therefore, AO 1989–5 permits the Court to infer that the Plaintiffs both owned the money. Because the Court is ruling on a motion to dismiss for failure to state a claim, where all facts are construed in favor of the Plaintiffs, the Court will infer this fact.

Accordingly, the motion to dismiss on the ground that the Plaintiffs fail to allege that they own the money is denied.

## 2. Legality of the Actions by the FEC

The Defendant also argues that it was not unlawful for the Dole Committee to have sent the money to the United States Treasury. All acts were legal because the Dole Committee followed AO 1996–5. Further, the Court should defer to the FEC's interpretation of the regulation.

The Court cannot accept this argument. First, *Pan American World Airways, supra,* 122 F.Supp. at 683, 129 Ct.Cl. at 55, directs this Court to assume that the agency acted illegally when ruling on a jurisdictional question.

■ Courts generally defer to the agency's interpretation of a statute. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). However, courts "must reject administrative constructions of the statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).

■ Here, the Plaintiffs have stated a prima facie case to challenge the correctness of the agency's interpretation in AO 1996–5. (The Plaintiffs take much of their reasoning from the dissenting opinion in AO 1996–5.) Moreover, when an agency changes its position, the agency's new interpretation is entitled to less deference. See, *Pauley v. Beth-Energy Mines, Inc.,* 501 U.S. 680, 698, 111 S.Ct. 2524, 2535, 115 L.Ed.2d 604 (1991) (stating "As a general matter, of course, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views."); see also, *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

■ Thus, the Court finds that the Plaintiffs have stated a cause of action that the FEC acted illegally. The Court will not grant the motion to dismiss on this ground.

## 3. The Plaintiffs' Own Illegal Conduct

Finally, the Defendant argues that the Court should not "construe the regulation as conferring a right of recovery upon contributors based upon their having violated the Federal Election Campaign Act." In conjunction with this argument, the Defendant also argues that courts have refused to reward people for their illegal conduct. The Defendant cites *Clark v. United States,* 102 U.S. 322, 331–32, 26 L.Ed. 181 (1880); *Giudice v. United States,* 61 Ct.Cl. 383 (1925); and *United States v. Farrell,* 606 F.2d 1341 (D.C.Cir.1979).

This argument, too, misses the mark. The Defendant fundamentally misreads 11 C.F.R. § 103.3(b)(2). The regulation states "the treasurer shall refund the contribution to the contributor within thirty days of the date on which the illegality is discovered." The lan-

---

**8.** The Court admittedly is perplexed as to why the Plaintiffs did not remove all doubt about this issue. Nevertheless, the Court will examine the complaint as it currently reads.

guage "shall refund" seems clear enough on its face to support the proposition that the Plaintiffs are entitled to a refund and the regulation confers a right of recovery on them. Whether the Defendant ultimately can establish the reasonableness of AO 1996–5 is not for the Court to decide now.

This entitlement, based on a regulation, also distinguishes the present case from those cited by the Defendant. In *Clark* and *Giudice,* the issues concerned whether the Plaintiff could recover money paid as a bribe. In *Farrell,* the Claimant attempted to recover money paid to an undercover officer for illegal drugs. No regulation authorizes the return of bribe money or drug money. In contrast, 11 C.F.R. § 103.3(b)(2) authorizes the return of illegal campaign money.

Finally, the Court notes that the position taken by the FEC in AO 1996–5 has some attraction. The majority opinion recognizes that disgorging the illegal donations to the United States Treasury accomplishes the goal of ensuring that campaigns do not profit from an illegal contribution. Moreover, if donors knew that an illegal donation would not be returned to them, donors may be more diligent in obeying the law. Despite these advantages to AO 1996–5, this Court must still contend with the issue of whether the agency's policy was properly changed by means of AO 1996–5.

Thus, the Court denies the motion to dismiss on the ground that the Plaintiffs' illegal conduct precludes recovery. The regulation expressly instructs recovery.

### C. Conclusion—Failure to State a Claim

The Defendant's motion to dismiss for failure to state a claim is denied.

## IV. ORDER

Counts Two and Three are dismissed from the lawsuit.

The Plaintiffs are required to file a new amended complaint that eliminates Counts Two and Three within ten days of this order.

The Defendant's answer is due ten days after the filing of the amended complaint.